FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

HECTOR JUAN AYALA,
       *Petitioner-Appellant*,

              v.

ROBERT K. WONG, Warden,
       *Respondent-Appellee.*

No. 09-99005

D.C. No.
3:01-CV-01322-IEG-PLC

AMENDED OPINION
AND ORDER

Appeal from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Chief District Judge, Presiding

Argued and Submitted
February 9, 2012—Pasadena, California

Filed September 13, 2013
Amended February 25, 2014

Before: Stephen Reinhardt, Kim McLane Wardlaw,
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Reinhardt;
Dissent by Judge Callahan;
Order;
Dissent to Order by Judge Ikuta

## SUMMARY[*]

### Habeas Corpus/Death Penalty

The panel replaced its opinion and dissent, filed on September 13, 2013 and published at 730 F.3d 831, with an amended opinion and amended dissent, denied a petition for rehearing en banc on behalf of the court, and ordered that no further petitions shall be entertained in a case in which the panel reversed the district court's denial of a 28 U.S.C. § 2254 habeas corpus petition challenging a conviction and capital sentence for murder and robbery, based on a violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

In the amended opinion, the panel reversed and remanded with instructions to grant the writ and order that petitioner be released from custody unless the state elects to retry him within a reasonable amount of time. The panel first explained that, as to whether the exclusion of petitioner and his counsel from the ex parte *Batson* proceedings was federal constitutional error, the California Supreme Court either resolved the issue in petitioner's favor or did not reach it. Reviewing de novo, the panel held that the exclusion of petitioner and his counsel constituted prejudicial error that likely prevented petitioner from showing that the prosecution utilized its peremptory challenges in a racially discriminatory manner. The panel then held that the state court's harmless error finding had a prejudicial effect on the verdict.

In the amended dissent, Judge Callahan disagreed with the majority's holding because it inappropriately

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

deconstructed the California Supreme Court's opinion to justify its evasion of the Anti-Terrorism and Effective Death Penalty Act to review the state court's decisions de novo, and because petitioner's federal claim is barred by *Teague v. Lane*, 489 U.S. 288 (1989).

Judge Ikuta, joined by Judges O'Scannlain, Tallman, Bybee, Callahan, Bea, M. Smith, and N.R. Smith, dissented from the denial of rehearing en banc. Judge Ikuta disagreed with the panel's de novo review of petitioner's *Batson* claim based on a novel theory for rebutting the presumption that the state court adjudicated the federal claim on the merits. Judge Ikuta wrote that the majority's reasoning ignores recent Supreme Court jurisprudence and conflicts with this court's sister circuits.

**COUNSEL**

Robin L. Phillips and Anthony J. Dain, Procopio, Cory, Hargreaves & Savitch LLP, San Diego, California, for Petitioner-Appellant.

Robin H. Urbanski, Deputy Attorney General of California, San Diego, California, for Respondent-Appellee.

**OPINION**

REINHARDT, Circuit Judge:

State prisoner Hector Juan Ayala ("Ayala") appeals the denial of his petition for a writ of habeas corpus. During the selection of the jury that convicted Ayala and sentenced him to death, the prosecution used its peremptory challenges to strike all of the black and Hispanic jurors available for challenge. The trial judge concluded that Ayala had established a prima facie case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986), but permitted the prosecution to give its justifications for the challenges of these jurors in an in camera hearing from which Ayala and his counsel were excluded. The trial judge then accepted the prosecution's justifications for its strikes without disclosing them to the defense or permitting it to respond. The California Supreme Court held that the trial court erred as a matter of state law, relying on a number of federal cases, but found that any error—state or federal—was "harmless."

We conduct our review of Ayala's appeal under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). In reviewing Ayala's federal claim, the state court

faced two questions: first, whether the exclusion of Ayala and his counsel from the ex parte *Batson* proceedings was federal constitutional error, and, second, whether any such error was harmless. We conclude that the state court either resolved the first question in Ayala's favor or did not reach it. We therefore apply de novo review, and conclude that there was federal constitutional error. Turning to the second question, harmlessness, we conclude that the state court found that any federal constitutional error was harmless. We review that determination under *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), and conclude that the violation of Ayala's *Batson* rights was prejudicial. We therefore remand with instructions to grant the writ.

## I.

On April 26, 1985, Jose Luis Rositas, Marcos Antonio Zamora, and Ernesto Dominguez Mendez were shot and killed in the garage of an automobile repair shop in San Diego, California. A fourth victim, Pedro Castillo, was shot in the back but managed to escape alive. Castillo identified Ayala, his brother Ronaldo Ayala, and Jose Moreno as the shooters. He claimed that these men had intended to rob the deceased, who ran a heroin distribution business out of the repair shop.

Ayala was subsequently charged with three counts of murder, one count of attempted murder, one count of robbery and three counts of attempted robbery. The information further alleged that the special circumstances of multiple murder and murder in the attempted commission of robberies were applicable in his case. A finding that one of these special circumstances was true was required in order for Ayala to be eligible for the death penalty.

Jury selection began in San Diego in January 1989. Each of the more than 200 potential jurors who responded to the summons and survived hardship screening was directed to fill out a 77-question, 17-page questionnaire. Over the next three months, the court and the parties interviewed each of the prospective jurors regarding his or her ability to follow the law, utilizing the questionnaires as starting points for their inquiry. Those jurors who had not been dismissed for cause were called back for general voir dire, at which smaller groups of jurors were questioned by both the prosecution and the defense. The parties winnowed the remaining group down to twelve seated jurors and six alternates through the use of peremptory challenges. Each side was allotted twenty peremptory challenges which could be used upon any of the twelve jurors then positioned to serve on the jury. After twelve seated jurors were finally selected, both parties were allotted an additional six peremptory challenges to be used in the selection of alternates.

The prosecution employed seven of the 18 peremptory challenges it used in the selection of the seated jurors to dismiss each black or Hispanic prospective juror who was available for challenge, resulting in a jury that was devoid of any members of these ethnic groups. In response, Ayala, who is Hispanic, brought three separate motions pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), claiming that the prosecution was systematically excluding minority jurors on the basis of race.[1]

---

[1] The motions were technically made under *People v. Wheeler*, 22 Cal.3d 258 (1978), the California analogue to *Batson*. Because "a *Wheeler* motion serves as an implicit *Batson* objection," we characterize Ayala's motions, and the proceedings that followed, as being pursuant to *Batson*. *Crittenden v. Ayers*, 624 F.3d 943, 951 (9th Cir. 2010).

The defense made its first *Batson* motion after the prosecution challenged two black jurors. The trial court found that the defense had not yet established a prima facie case of racial discrimination, but nevertheless determined that it would require the prosecution to state its reasons for challenging the jurors in question. At the prosecutor's insistence, and despite the defense's objections, the court refused to let the defendant or his counsel be present at the hearing in which the prosecution set forth these reasons and the court determined whether they were legitimate.

The trial judge continued to employ this ex parte, in camera procedure to hear and consider the prosecutor's purported reasons for challenging minority jurors following the defense's second and third *Batson* motions. He did so despite his determination, by the third motion, that the defense had established a prima facie showing of racial discrimination.

Ultimately, the trial judge concluded that the prosecutor had proffered plausible race-neutral reasons for the exclusion of each of the seven minority jurors, and denied the defense's *Batson* motions. Although the ex parte *Batson* proceedings were transcribed, this transcript — and thus, the prosecution's proffered race-neutral reasons for striking the seven black and Hispanic jurors — were not made available to Ayala and his counsel until after the conclusion of the trial.

The jury convicted Ayala of all counts save a single attempted robbery count, and found true the special circumstance allegations. At the penalty phase, it returned a verdict of death.

Early in the process of jury selection, the trial judge had instructed the parties to return to the court all the questionnaires the prospective jurors had completed, and advised them that he would be "keeping the originals." At some point during or following the trial, however, all questionnaires, save those of the twelve sitting jurors and five alternates, were lost. The questionnaires of four additional jurors — including the sixth alternate — were located in the defense counsel's files, but the remaining 193 questionnaires have never been located.

On direct appeal from his conviction, Ayala challenged the trial court's use of ex parte *Batson* proceedings. He also claimed that the loss of the jury questionnaires deprived him of his right to a meaningful appeal of the denial of his *Batson* motion. A divided California Supreme Court upheld his conviction on the basis of harmless error and also upheld the sentence. *People v. Ayala*, 6 P.3d 193 (Cal. 2000). The court unanimously held that under state law the trial judge had erred in conducting the *Batson* proceedings ex parte. *Id.* at 204 (majority opinion); *id.* at 291 (George, C.J., dissenting). A majority went on to hold, however, that any error was harmless beyond a reasonable doubt. *Id.* at 204. It also concluded that the loss of the questionnaires was harmless beyond a reasonable doubt. *Id.* at 208. In dissent, Chief Justice George, joined by Justice Kennard, expressed his disagreement with the majority's "unprecedented conclusion that the erroneous exclusion of the defense from a crucial portion of jury selection proceedings may be deemed harmless." *Id.* at 221 (George, C.J., dissenting). Ayala's petition for certiorari was denied by the United States Supreme Court on May 14, 2001. *Ayala v. California*, 532 U.S. 1029 (2001).

Ayala timely filed his federal habeas petition. The district court denied relief, but issued a Certificate of Appealability as to Ayala's *Batson*-related claims and his claim that the state had violated his Vienna Convention right to consular notification.[2]  Ayala now appeals.

## II.

In order for this court to grant Ayala habeas relief, we must find that he suffered a violation of his federal constitutional rights.  To do so, Ayala must demonstrate both that (1) the state court committed federal constitutional error and (2) that he was prejudiced as a result.  We discuss the issue of error in Part III and the issue of prejudice in Part IV.

Here, Ayala alleges two federal constitutional violations, the first of which is the principal focus of this opinion. Ayala's primary claim relates to his exclusion and his counsel's from the *Batson* proceedings.  Ayala's secondary claim, which exacerbates the overall error in this case, relates to the state court's loss of the juror questionnaires prior to Ayala's appeal.  We discuss these errors separately, in Sections III.A and III.B respectively, devoting much greater attention to the first, although the second would strongly bolster the first.

The state, in defending against the grant of habeas relief to Ayala, makes two principal arguments. First, it contends that Ayala was not prejudiced by his exclusion or his counsel's from the *Batson* proceedings, or by the loss of the

---

[2] Because we conclude that Ayala is entitled to relief on his *Batson*-related claims, we need not decide whether the district court erred in rejecting his Vienna Convention claim.

juror questionnaires. This was the state court's basis for denying Ayala relief.

Second, the state raises a procedural objection that Ayala's claim regarding his exclusion during the *Batson* proceedings is barred by *Teague v. Lane*, 489 U.S. 288 (1989). "[I]n addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272 (2002). We conduct the requisite *Teague* analysis in Part V of this opinion.

In Part VI of this opinion, we respond to arguments made by the dissent, and in Part VII we set forth our conclusion and remand to the district court with instructions to grant Ayala the writ of habeas corpus.

## III.

As stated above, Ayala alleges that the state court committed two distinct federal constitutional errors. The first alleged error relates to the state court's exclusion of Ayala and his counsel from the *Batson* proceedings (referred to sometimes in this opinion as the "ex parte *Batson* proceedings"). The second error relates to the state court's loss of the juror questionnaires. We address each error in turn, concluding that Ayala is correct and that the state court committed both federal constitutional errors, although we hold that the first error is sufficient in itself to warrant the issuance of the writ, and the second simply bolsters the first.

**A.**

"For more than a century, [the Supreme] Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Georgia v. McCollum*, 505 U.S. 42, 44 (1992). *Batson* established the three-step inquiry used to determine whether this basic constitutional guarantee has been violated. First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges in a racially discriminatory manner. *Batson*, 476 U.S. at 96. Such a showing may be made, as the trial judge concluded it was in Ayala's case, where the prosecution has engaged in a pattern of strikes against jurors of a particular race. *Id.* at 97. Second, once the defendant has made a prima facie showing, "the burden shifts to the State to come forward with a neutral explanation for challenging" the jurors. *Id.* Third, the trial court must then determine whether, taking into consideration the prosecutor's explanations for his conduct, "the defendant has established purposeful discrimination." *Id.* at 98.

Ayala contends that the exclusion of the defense from the proceedings in which the prosecution justified its strikes of the seven black and Hispanic jurors, and the trial court accepted those justifications, violated his right to the assistance of counsel and his right to be personally present and to assist in his defense. He further contends that these errors prevented him from ensuring that the prosecution did not violate his fundamental right to a jury chosen free from racial discrimination.

Before we may evaluate the merits of Ayala's contention, we must first determine the appropriate standard of review to

apply.    Specifically, because Ayala's habeas petition is subject to the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), *see Kennedy v. Lockyer*, 379 F.3d 1041, 1046 (9th Cir. 2004), we must determine whether Ayala's claim of federal constitutional error was adjudicated on the merits, and if so what the nature of that adjudication was.[3] We do so in Section III.A.1, concluding that the California Supreme Court did not find against Ayala on the merits of his claim of federal constitutional error, and therefore § 2254(d) does not require deference to such a determination. We then conclude in Section III.A.2 that, under de novo review, Ayala's constitutional rights were violated when he and his counsel were excluded from stages two and three of the *Batson* proceedings.

---

[3] "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."    *Harrington v. Richter*, 131 S. Ct. 770, 784 (2011). Accordingly, if the California Supreme Court made an "adjudication on the merits" that the exclusion of Ayala and his counsel from his *Batson* proceedings was not erroneous under federal constitutional law, then Ayala would not be entitled to relief on his claim unless that state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

## 1.

The first question is whether the state court made an adjudication on the merits as to whether the exclusion of Ayala and his counsel from the *Batson* proceedings was federal constitutional error. Answering that question is significantly more difficult in this case than in most federal habeas appeals. We are confronted with an especially unclear state court decision that requires us to delve more deeply than is typical into the question of what the state court did or did not "adjudicate on the merits" the question of constitutional error. The California Supreme Court, when confronted with Ayala's claim, concluded that the exclusion of the defense from these proceedings was, in fact, erroneous as a matter of state law. The state court began its analysis by stating the legal framework for Ayala's challenge. It identified the three-step process for a *Batson* challenge and noted that, under *Batson*, no particular procedures were required. *Ayala*, 6 P.3d at 202. It then made three distinct legal determinations. First, it found that "no matters of trial strategy were revealed" during the *Batson* proceedings in Ayala's case. *Id.* at 202–03. Second, it held "as a matter of state law" that it was "error to exclude defendant from participating in the hearings on his [*Batson*] motions." *Id.* at 203. The California Supreme Court observed that "it seems to be almost universally recognized that ex parte proceedings following a [*Batson*] motion . . . should not be conducted unless compelling reasons justify them." *Id.* at 203. Because no matters of trial strategy were revealed here and thus no such "compelling reasons" existed, the state court "concluded that error occurred under state law." *Id.* at 204. Third, turning to the question of prejudice (a subject we discuss in Part IV), the state court

conclude[d] that the error was harmless under
state law (*People v. Watson* (1956) 46 Cal.2d
818, 836, 299 P.2d 243), and that, if federal
error occurred, it, too, was harmless beyond a
reasonable doubt (*Chapman v. California*
(1967) 386 U.S. 18, 24, 87 S. Ct. 824, 17
L.Ed.2d 705) as a matter of federal law.

*Id*; *see also id.* at 204–08 (analyzing prejudice further).
Having found error but having also deemed it harmless, the
state court denied Ayala relief.

There is no doubt that the California Supreme Court
found that the exclusion of Ayala and his counsel from the
*Batson* proceedings was erroneous under state law. The state
court made no express finding with respect to whether the
exclusion of Ayala and his counsel from the *Batson*
proceedings was also error under federal constitutional law.
Although it is not easy to interpret a state court's silence,
there are only three possible determinations it could have
made in this case. The California Supreme Court either

> (1) held that there was error under federal
> constitutional law;

> (2) did not decide whether there was error
> under federal constitutional law; or

> (3) held that there was no error under federal
> constitutional law.

> [hereinafter discussed as Options 1, 2, and 3
> respectively]

Of these three possibilities, only under Option 3—in which the state court made an unfavorable determination on the merits of Ayala's claim of federal constitutional error—would § 2254(d) require deference to a determination against Ayala.[4] Thus, we need determine only whether the California Supreme Court's silence is best interpreted as Option 3—i.e., as holding that the exclusion of Ayala and his counsel from the *Batson* proceedings was *not* erroneous under federal constitutional law.

---

[4] Under Option 1, i.e., if the California Supreme Court found error under federal constitutional law, as well as under state law, an argument can be made that we would be required to accord AEDPA deference to that determination. That is, we could be required to give AEDPA deference *in favor of* the petitioner. An argument can also be made that § 2254(d), by its text and purpose, is inapplicable to a claim on which the petitioner prevailed in state court, and therefore the claim should be reviewed de novo. Finally, because habeas review is intended to provide relief to a prisoner and not to the state, an argument can be made that a state court's determination in favor of petitioner cannot be relitigated on habeas review. The question whether to accord AEDPA deference to a state court determination favorable to a petitioner, review that determination de novo or not review it at all is a question of first impression that we need not decide in this case. In all three situations—de novo review, AEDPA deference in favor of the petitioner, or no review—we would conclude that there was federal constitutional error in Ayala's trial. See discussion *infra* Part III(A)(2).

Under Option 2, i.e., if the California Supreme Court found error with respect to the *Batson* issue as a matter of state law only and did not decide the question of federal constitutional error on the merits, our review would be de novo. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (reviewing de novo because the "[state] courts did not reach the merits of [the petitioner's constitutional] claim"); *Lott v. Trammel*, 705 F.3d 1167, 1218 (10th Cir. 2013); *Harris v. Thompson*, 698 F.3d 609, 624 (7th Cir. 2012). A decision "as a matter of state law only" perforce does not constitute an "adjudication on the merits" of a federal claim, and therefore § 2254(d) would not apply.

In determining how to interpret state court silence on the question of federal constitutional error, we consider, inter alia, two recent Supreme Court decisions: *Richter*, 131 S. Ct. 770, and *Johnson v. Williams*, 133 S. Ct. 1088 (2013). In both *Richter* and *Williams*, the Supreme Court applied a rebuttable presumption that, even though the state court was silent with respect to a fairly presented federal claim, the claim was adjudicated on the merits. The Court's rationale was that, because the state court denied relief overall, it necessarily adjudicated (and rejected) the federal claim. For example, in the context of a summary denial, as in *Richter*, the state court could not have denied relief overall without having rejected, and thus adjudicated, every fairly presented federal claim. Accordingly, the Supreme Court held, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 131 S. Ct. at 784. The same was true when, in *Williams*, the state court rejected a state law claim, was silent with respect to a fairly presented federal claim, and denied relief overall. *See Williams*, 133 S. Ct. at 1091. There too, the state court could not have denied relief overall without having rejected, and thus adjudicated, the federal claim presented by the petitioner. Thus, the Supreme Court held, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits—but that presumption can in some limited circumstances be rebutted." *Id.* at 1096 (discussing *Richter*). Here, the presumption is inapplicable for several reasons. We need mention only a couple. First, it was not necessary for the state court to reject the claim of federal constitutional error on the merits in order for it to deny relief to the petitioner. To the contrary, the state court

denied Ayala relief on his federal constitutional claim only because it concluded that the error (if any) was harmless. Second, the facts of this case dictate the conclusion that the California Supreme Court believed that the error under state law also constituted federal constitutional error.

We believe that there are only two plausible interpretations of the California Supreme Court's decision—either Option 1 or Option 2. The most likely interpretation is Option 1, i.e., that the California Supreme Court held implicitly that there was error under state law *and* under federal constitutional law alike. Notably, the California Supreme Court based its determination that the trial court's exclusion of Ayala and his counsel was impermissible "as a matter of state law," *Ayala*, 6 P.3d at 203, on the fact that it was "almost universally recognized" that ex parte *Batson* proceedings are erroneous absent a compelling reason, expressly relying for this conclusion on multiple federal cases that themselves relied on federal constitutional law. *Id.* (citing *United States v. Roan Eagle*, 867 F.2d 436, 441 (8th Cir. 1989); *United States v. Garrison*, 849 F.2d 103, 106 (4th Cir. 1988); *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987)). The court then quoted extensively from *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987), in which we held that the ex parte proceedings in that case violated federal constitutional law. *Ayala*, 6 P.3d at 203–04. In summarizing its discussion of error (before moving to prejudice), the California Supreme Court stated: "We have concluded that error occurred under state law, and we have noted *Thompson*'s suggestion that excluding the defense from a [*Batson*]-type hearing may amount to a denial of due process." *Id.* at 204. The obvious message here is that the California Supreme Court believed that the federal constitutional issue should be decided the same way as the

state law issue. This is consistent with the fact that California courts interpret a violation of *Wheeler* — California's state equivalent of *Batson* — as proof of a violation of *Batson*. *See People v. Yeoman*, 72 P.3d 1166, 1187 (Cal. 2003); *see also Johnson v. California*, 545 U.S. 162 (2005) (holding that *Wheeler* is more demanding than *Batson*). Thus, if we were required to determine whether the California Supreme Court adjudicated Ayala's claim of federal constitutional error on its merits in favor of the petitioner or the state, we would hold without question that the California Supreme Court found error in petitioner's favor under both state law *and* federal constitutional law—i.e., Option 1.

In support of this conclusion, we find instructive—and likely dispositive—the Supreme Court's discussion in Part III of *Williams*. In that case, the petitioner challenged the dismissal of a holdout juror under both California state law and under the Sixth Amendment right to a fair jury. The California Court of Appeal found that there was no error under state law. It did not expressly decide petitioner's federal constitutional claim but, in the course of deciding the state law claim, cited a California Supreme Court case, *People v. Cleveland*, 21 P.3d 1225 (Cal. 2001). *Cleveland* in turn discussed three federal appellate cases in depth, each of which was based on the Sixth Amendment. In *Williams*, the Supreme Court explained *Cleveland* as follows:

> *Cleveland* did not expressly purport to decide a federal constitutional question, but its discussion of [the federal cases] shows that the California Supreme Court understood itself to be deciding a question with federal constitutional dimensions. *See* 25 Cal.4th, at 487, 106 Cal. Rptr. 2d 313, 21 P.3d, at 1239

> (Werdegar, J., concurring) (emphasizing importance of careful appellate review in juror discharge cases in light of the "constitutional dimension to the problem").

*Williams*, 133 S. Ct. at 1098. A unanimous Supreme Court then concluded that because the state court found no error under state law on the basis in part of federal cases relying on federal constitutional law, it likewise found no error using that same analysis to decide the question under federal constitutional law. *Id.* at 1098–99. The obverse is necessarily true with respect to the state court's analysis in this case. The California Supreme Court, in finding that the exclusion of Ayala and his counsel from the *Batson* proceedings *was* erroneous under state law, cited to multiple federal cases relying on federal law. It did not expressly purport to decide the federal constitutional question, but it too must have understood itself to be deciding a question with federal constitutional dimensions and to be deciding it in petitioner's favor by its reliance on cases that held analogous conduct to be erroneous under the federal Constitution. Thus, if we were compelled to determine whether the California Supreme Court adjudicated Ayala's claim of federal constitutional error on its merits in favor of the petitioner or the state, we would hold without the slightest hesitation that it found that the error occurred under federal constitutional law—i.e., Option 1. Accordingly, if we apply § 2254(d) at all, we defer to a holding that there *was* federal constitutional error, deference that favors Ayala. *See* discussion *supra* at 15 n. 4.

Alternatively, we are willing to assume another, albeit weaker, interpretation of the California Supreme Court's decision that leads to the same result. Under that interpretation, the state court did not, deliberately or

otherwise, decide whether there was error under federal law, i.e., Option 2 above. In short, it failed to decide the merits of the question of federal constitutional error because it thought there was nothing to be gained by doing so. It had already decided that the state court had erred on state law grounds and nothing further was to be gained by holding that it was also a federal constitutional error. *Richter* and *Williams* instruct us to afford a rebuttable presumption that a fairly presented claim was "adjudicated on the merits" for purposes of § 2254(d), but this presumption is rebuttable if there is "any indication or state-law procedural principles" supporting the conclusion that the state court did not adjudicate the federal claim on the merits. *Richter*, 131 S. Ct. at 784–85. Here, the California Supreme Court denied Ayala relief overall but did so by (1) finding that the trial court committed error on state law grounds, (2) failing to make any express determination of error on federal constitutional grounds, and (3) finding any error harmless under *both* the state and federal standards for harmless error. In the context of these holdings, the rebuttable presumption that *Richter* and *Williams* instruct us to afford is, in fact, rebutted. The California Supreme Court, by finding any alleged error harmless under both the state and federal standards for harmless error, had no reason to reach the question of whether federal constitutional error occurred. This is not an unusual practice; courts often choose not to decide the question whether an error occurred by deciding that any error was harmless. Indeed, we have found no published opinion in which, after a state court has denied relief based on harmless error, a federal court has presumed that the state court adjudicated the merits of the question of error.

In fact, the California Supreme Court would have had good reason not to decide the merits of the issue of federal

constitutional error here. "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that [courts] ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Clinton v. Jones*, 520 U.S. 681, 690 n.11 (1997) (quoting *Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944)). Moreover, where the intersection of state law and federal constitutional law is complex, a state court may very well prefer to decide only the state law claim and not reach a federal constitutional question. The California Supreme Court, by finding error under state law, determined the question of error conclusively. This served the purpose of providing guidance to the lower state courts. Finding that the state law error also constituted federal constitutional error (or did not) would, however, have served no purpose, once the state court determined that any error was harmless. (The state court was free to decide the issues presented in whatever order it chose.) Indeed, respect for state judges requires recognizing that a state court's silence with respect to a fairly presented federal claim may be intentional and prudent.

Our reasoning finds support in a different line of Supreme Court cases, in which the Court has interpreted state court silence with regard to a particular issue as not constituting an "adjudication on the merits." Many of these cases involved claims of ineffective assistance of counsel brought under *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* claims have two prongs, deficiency of counsel's performance and prejudice to the defendant; failure on either prong is dispositive. *Id.* at 680. Accordingly, state courts frequently decide *Strickland* claims by rejecting either deficiency or prejudice and remain silent with respect to the other prong. When these claims are raised in federal habeas proceedings, the Supreme Court has repeatedly interpreted that silence as

a failure to reach the other prong and therefore *not* an "adjudication on the merits" of it. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("Our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below *reached* this prong of the *Strickland* analysis." (emphasis added)); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) ("Because the state courts found the representation adequate, *they never reached the issue* of prejudice, and so we examine this element of the *Strickland* claim de novo." (emphasis added) (internal citations omitted)); *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009) ("Because the state court *did not decide* whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim de novo." (emphasis added)). Nor has the Supreme Court limited this reasoning to *Strickland* claims. In *Cone v. Bell*, 556 U.S. 449 (2009), the petitioner raised a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), in his federal habeas petition. The state habeas court dismissed the claim based on a factual determination that the Supreme Court held was erroneous. *Id.* at 466–69. Turning to the merits of the claim, the Supreme Court stated:

> Because the Tennessee courts *did not reach* the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to "any claim that was adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d). Instead, the claim is reviewed de novo. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390, 125 S. Ct. 2456, 162 L.Ed.2d 360 (2005) (de novo review where state courts did not reach prejudice prong under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052,

> 80 L.Ed.2d 674 (1984)); *Wiggins v. Smith*, 539 U.S. 510, 534, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003) (same).

*Id.* at 472 (emphasis added). Again, even though the state court was silent with respect to the merits of Cone's *Brady* claim, the Supreme Court did not presume that the claim was adjudicated on the merits. Thus, as *Wiggins*, *Rompilla*, *Porter*, and *Cone* demonstrate, and as both *Richter* and *Williams* have recognized, in some instances, a state court's silence with respect to a part of a claim should not be interpreted as an "adjudication on the merits" on that part for purposes of § 2254(d).

We summarize the law as set forth by the Supreme Court as follows. There are circumstances in which, even if a state court has denied relief overall, a state court's silence with respect to a fairly presented federal issue cannot be interpreted as an "adjudication on the merits" of that issue for purposes of § 2254(d), because the rebuttable presumption cited in *Richter* and *Williams* is rebutted by the legal principles involved (including the principle of constitutional avoidance) and factual context applicable to a particular case. *See Wiggins v. Smith*, 539 U.S. at 534; *Rompilla v. Beard*, 545 U.S. at 390; *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009); *Cone v. Bell*, 556 U.S. at 472.

This is such a case. As explained earlier, the California Supreme Court had no reason to reach Ayala's federal constitutional claim once it had decided that (1) the alleged error occurred as a matter of state law, (2) the error was harmless under the state and federal standards for harmless error, and (3) whether or not that occurrence also violated federal constitutional law was of no consequence.

Furthermore, under long established legal principles, the California Supreme Court had every reason not to decide unnecessarily a question of federal constitutional law. Thus, we find merit in Option 2, i.e., that the California Supreme Court did not decide whether there was error under federal constitutional law.

We recognize that it remains unclear whether the California Supreme Court decision is better read as Option 1 or Option 2.[5] What is clear is that Option 3—i.e., that the California Supreme Court held that, although there was error under state law, there was none under federal constitutional law—is *not* the best, or even a plausible reading of the state court opinion.[6] In this case, because the California Supreme

---

[5] The dissent therefore misstates our holding when it claims we have "decide[d] that the California Supreme Court did not determine whether there was error under federal law." Dissent at 28. That is only one of two holdings we find possible; the other is that the Supreme Court decided that there was federal constitutional error for the same reasons that there was state constitutional error. It follows that it is also not true that we have concluded, as the dissent claims, that there is "no reason" to give the California Supreme Court decision § 2254(d) deference. As explained *supra* at 15 n. 4, if the California Supreme Court held that there *was* federal constitutional error — Option 1 — we might give this holding § 2254(d) deference, although the question of what level of deference to afford a finding *in favor* of petitioner is a question of first impression that we need not decide here.

[6] In other words, because *Wheeler* is *Batson*-plus, and because its *Wheeler* holding relied on *Batson* case law, it is impossible that the California Supreme Court found no *Batson* error on the merits while finding *Wheeler* error on the merits. It either found *Batson* error or did not reach the federal claim. Therefore, there is either no merits decision demanding deference or a merits decision *favoring Ayala*. The latter possibility is unchartered territory, but, regardless, we review under a standard no less favorable to Ayala than de novo.

Court found error under state law by citing to federal cases relying on federal law *and* because it "noted" that there might have been a violation of federal law, *Ayala*, 6 P.3d at 202–04, Option 3 is a wholly implausible reading of the California Supreme Court decision.[7] Accordingly, we have no reason to give § 2254(d) deference to such a holding in evaluating Ayala's claim. (As noted *supra* in Part II, we will discuss in Part IV the question whether the California Supreme Court's determination that any error was harmless was erroneous.)

---

[7] Even the dissent struggles to argue that Option 3 is the best reading. First, it states that the California Supreme Court "rejected" Ayala's federal claim. Dissent at 81. Then, suddenly less confident, the dissent argues only that "[t]here may be some question as to whether the California Supreme Court actually found that there was federal error." *Id*. Finally, backing away from its original claim even more, the dissent seems to endorse Option 1, suggesting that the Supreme Court found that there *was* federal constitutional error: "The California Supreme Court's evaluation of the *Batson/Wheeler* issue was clear and concise. It held that 'it was error to exclude defendant from participating in the hearings on the *Wheeler* motions.'" Dissent at 83 (citing *Ayala*, 6 P.3d at 203). The dissent accuses us of "admitting" that the California Supreme Court cited both *Batson* and *Thompson* in making this "clear" finding of *Wheeler* error. *Id*. (citing *Ayala*, P.3d at 203). Of course we admit this; our argument is that *because* the California Supreme Court cited *Batson* and *Thompson* in finding state constitutional error, the court likely found federal constitutional error as well. It is the dissent's position that is perplexing: while acknowledging that the California Supreme Court cited federal cases in holding for Ayala on his claim of state constitutional error, it concludes that the court "implicitly reject[ed]" Ayala's federal constitutional error claim. Dissent at 83–84. Given *Williams*'s instruction that a state court's citation to federal cases in deciding a state claim "shows that [it] underst[ands] itself to be deciding a question with federal constitutional dimensions," and given that the federal cases the California Supreme Court cited deemed analogous conduct to constitute federal constitutional error, the dissent's reading that these same cases compel the conclusion that the conduct here is *not* federal constitutional error makes little sense. *See Williams*, 133 S. Ct. at 1098.

## 2.

Having determined that only Options 1 and 2 are plausible readings of the California Supreme Court decision, we proceed to review de novo Ayala's claim that his exclusion from stages two and three of the *Batson* proceedings violated the federal constitution.[8]

Under de novo review, it is clear that it was federal constitutional error to exclude both Ayala and his counsel from stages two and three of the *Batson* proceedings. As the California Supreme Court recognized, our circuit had already held in *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987) that, in the absence of a "compelling justification" (e.g., the disclosure of trial strategy) for conducting ex parte *Batson* proceedings, such exclusions violate federal constitutional law. *Id.* at 1258–59. Here, the California Supreme Court concluded – and neither party to this appeal disputes – that there was no such compelling justification for conducting ex parte *Batson* proceedings, as "no matters of trial strategy were revealed" by the prosecutor. *Ayala*, 6 P.3d at 261–62. As such, Ayala's claim is controlled by *Thompson*, and we conclude that federal constitutional error occurred when Ayala and his lawyer were excluded from stages two and three of the *Batson* proceedings.[9]

---

[8] As discussed *supra* at 15 fn. 4, there are three possible standards of review that could apply to the California Supreme Court's decision on federal constitutional error. Because, under the circumstances of this case, de novo review is the most searching of the three, we need not review the decision under the other two standards.

[9] Part of our reason for brevity in our analysis of Ayala's claim under de novo review is that his case is clearly controlled by *Thompson*. Another reason is that our analysis in Part V, in which we reject the state's *Teague*

## B.

Ayala also claims that the state's loss of an overwhelming majority of the jury questionnaires deprived him of a record adequate for appeal and thus violated his federal due process rights. Although less clear than with Ayala's first federal constitutional claim, the California Supreme Court also decided this claim on the basis of harmless error only. *Ayala*, 6 P.3d at 270 ("Thus, even if there was federal error, it was harmless beyond a reasonable doubt."). Accordingly, for the reasons explained *supra* Section III.A.1, we proceed with de novo review.

As the California Supreme Court recognized, Ayala has a due process right to a record sufficient to allow him a fair and full appeal of his conviction. *Id.* at 208 (citing *People v. Alvarez*, 14 Cal. 4th 155, 196 n.8 (1996)). If a state provides for a direct appeal as of right from a criminal conviction, it must also provide "certain minimum safeguards necessary to make that appeal 'adequate and effective.'" *Evitts v. Lucey*, 469 U.S. 387, 392 (1985) (quoting *Griffin v. Illinois*, 351 U.S. 12, 20 (1956)); *see also Coe v. Thurman*, 922 F.2d 528, 530 (9th Cir. 1990) ("Where a state guarantees the right to a direct appeal, as California does, the state is required to make that appeal satisfy the Due Process Clause.").

In *Boyd v. Newland*, we applied these principles in granting the habeas petition of an indigent defendant who had been denied a copy of his voir dire transcript because the state court had, in violation of clearly established federal law, determined that the transcript was not necessary to his *Batson*

argument, explains further why Ayala suffered a constitutional violation in this case.

appeal.  467 F.3d 1139 (9th Cir. 2006).  We held that "all defendants . . . have a right to have access to the tools which would enable them to develop their plausible *Batson* claims through comparative juror analysis."  *Id.* at 1150.  It follows that if the state's loss of the questionnaires deprived Ayala of the ability to meaningfully appeal the denial of his *Batson* claim, he was deprived of due process.[10]

This conclusion is not called into question by *Briggs v. Grounds*, 682 F.3d 1165 (9th Cir. 2012), cited in the dissent. Dissent at 103.  In *Briggs*, the petitioner had complete access to the juror questionnaires during the course of his state appeal.  In fact, he relied heavily on them in presenting a comparative juror analysis to support his *Batson* claim. 682 F.3d at 1171.  Thus Briggs's due process rights were not implicated.  The language cited by the dissent is lifted from a section of the opinion discussing whether, because those questionnaires were not included in the federal court record, we should credit the petitioner's characterization of those questionnaires over the state court's characterization.  *Briggs* is irrelevant for our purposes, i.e., whether Ayala's due process rights were implicated when California lost the juror questionnaires, thus rendering them unavailable for his *state court* appeal.

---

[10] The dissent ignores the holding of *Boyd* and instead plucks the words "voir dire transcript" out of the opinion to argue that *only* a voir dire transcript is necessary for comparative juror analysis. Dissent at 101–03. If our dissenting colleague believes that jury questionnaires are not tools for comparative juror analysis, we point her to *Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 256–57 (2005) and *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) (en banc), both of which utilized juror questionnaires in comparative juror analysis.

Ayala is entitled to relief on this claim only if the loss of the questionnaires was prejudicial *in se* or if it in conjunction with the *Batson* error discussed *supra* served to deprive him of a meaningful appeal. *Id.*; *see also Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). "[I]n analyzing prejudice . . . , this court has recognized the importance of considering the cumulative effect of multiple errors and not simply conducting a balkanized, issue-by-issue harmless error review." *Daniels v. Woodford*, 428 F.3d 1181, 1214 (9th Cir. 2005) (quoting *Thomas v. Hubbard*, 273 F.3d 1164, 1178 (9th Cir. 2001)).  Here, the loss of the questionnaires increased the prejudice that Ayala suffered as a result of the exclusion of defense counsel from *Batson* steps two and three, as it further undermined his ability to show that *Batson* had been violated. Accordingly, in determining whether Ayala is entitled to relief, we evaluate the prejudice caused by the loss of the questionnaires in conjunction with the harm caused by excluding defense counsel from the *Batson* proceedings. As we will explain immediately below, the analysis under *Brecht* regarding the *Batson* error demonstrates that the exclusion of Ayala and his counsel from the second and third stages of the *Batson* inquiry is sufficiently prejudicial to require reversal for that reason alone.[11]

## IV.

The California Supreme Court held that Ayala was not prejudiced by the trial court's exclusion of the defense from stages two and three of the *Batson* proceedings, by the state's

---

[11] Ayala also asserts that there is an Eighth Amendment right to appeal — and to a record adequate for appeal — in a capital case. *See Whitmore v. Arkansas*, 495 U.S. 149, 168 (1990) (Marshall, J., dissenting).  We need not decide this question here.

loss of the vast majority of the jury questionnaires, or by the
two errors considered together.  The Court declared itself
"confident that the challenged jurors were excluded for
proper, race-neutral reasons," *Ayala*, 6 P.3d at 204, concluded
that the exclusion of defense counsel was "harmless beyond
a reasonable doubt," *id.* (citing *Chapman v. California*,
386 U.S. 18, 24 (1967)), and held that despite the loss of the
questionnaires the record was "sufficiently complete for [it]
to be able to conclude that [the struck jurors] were not
challenged and excused on the basis of forbidden group bias."
*Id.* at 208.

We now address these same questions, and hold that
*Brecht v. Abrahamson*, 507 U.S. 619 (1993), requires us to
reach a different conclusion.

## A.

Ayala claims, first, that exclusion of defense counsel from
the *Batson* proceedings necessarily represented structural
error, and that he is entitled to relief without further inquiry
into whether he was prejudiced.  The state court's conclusion
that the error here was not structural — a conclusion implicit
in its application of the *Chapman* harmless error standard to
evaluate whether Ayala had suffered prejudice — is subject
to review under the deferential standard of § 2254(d).  *See*
*Byrd v. Lewis*, 566 F.3d 855, 862 (9th Cir. 2009).

The Supreme Court has defined as "structural" an error
that affects "the framework within which the trial proceeds,
rather than simply an error in the trial process itself."
*Arizona v. Fulminante*, 499 U.S. 279, 310 (1991).  Where this
line is drawn is not always clear.  *Compare, e.g.*, *Waller v.
Georgia*, 467 U.S. 39, 49 n.9 (1984) (violation of the right to

public trial requires automatic reversal), *with, e.g.*, *Rushen v. Spain*, 464 U.S. 114, 117–18 & n.2 (1983) (denial of a defendant's right to be present at trial is subject to harmless error review). While a violation of *Batson* is itself structural error, there is no Supreme Court decision addressing whether the exclusion of defense counsel from *Batson* proceedings constitutes structural error.

Ayala contends that the state court's decision represents an unreasonable application of the Supreme Court's clearly established rule that "no showing of prejudice need be made 'where assistance of counsel has been denied entirely or during a critical stage of the proceedings.'" Brief of Appellant at 22 (quoting *Mickens v. Taylor*, 535 U.S. 162, 166 (2002)); *see also United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984).[12] The use of the phrase "critical stage" in this excerpt can be somewhat deceptive: although the *Batson* proceedings represented a "critical stage" in the sense that Ayala had the right to counsel during those proceedings, they were not necessarily the sort of "critical stage" at which the deprivation of that right constituted structural error. *See United States v. Owen*, 407 F.3d 222, 227 (4th Cir. 2005). As the Fourth Circuit has explained, the statements in *Mickens* and *Cronic*

> rely on the Supreme Court's earlier usage of the phrase "critical stage," in cases such as *Hamilton v. [Alabama*, 368 U.S. 52 (1961)] and *White* [*v. Maryland*, 373 U.S. 59 (1963) (per curiam)] to refer narrowly to those

---

[12] As the state observes, although *Mickens* postdates the California Supreme Court's decision, the opinion simply restates the rule set forth 18 years earlier in *Cronic*.

> proceedings both at which the Sixth Amendment right to counsel attaches and at which denial of counsel necessarily undermines the reliability of the entire criminal proceeding. . . . [T]he Supreme Court has subsequently used the phrase "critical stage," in cases such as [*United States v.*] *Wade* [, 388 U.S. 218 (1967)] and *Coleman* [*v. Alabama*, 399 U.S. 1 (1970)], in a broader sense, to refer to all proceedings at which the Sixth Amendment right to counsel attaches -- including those at which the denial of such is admittedly subject to harmless-error analysis.

*Id.* at 228 (emphasis omitted).

In *Musladin v. Lamarque*, we held that the "clearly established" rule of *Cronic* is that a "critical stage" where the deprivation of counsel constitutes structural error is one that holds "significant consequences for the accused." 555 F.3d 830, 839 (9th Cir. 2009) (quoting *Bell v. Cone*, 535 U.S. 685, 695–96 (2002)). We identified as providing guidance in this inquiry Supreme Court decisions holding an overnight trial recess and closing arguments to be two such critical stages. *Id.* at 839–40 (citing *Geders v. United States*, 425 U.S. 80 (1976) and *Herring v. New York*, 422 U.S. 853 (1975)).

Given this fairly ambiguous standard, it was not an unreasonable application of clearly established federal law for the California Supreme Court to conclude that the exclusion of the defense from *Batson* steps two and three does not amount to a deprivation of the right to counsel such that the likelihood that the jury was chosen by unconstitutional means is "so high that a case-by-case inquiry is unnecessary."

*Mickens*, 535 U.S. at 166. As the state points out, it would be somewhat incongruous to conclude that the exclusion of counsel during *Batson* proceedings is a defect in the very structure of the trial if the same exclusion would be permissible were there some reason to keep the prosecution's justifications confidential. Thus, a "fairminded jurist[]," *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)), might conclude that *Batson* steps two and three are not a *Cronic*-type "critical stage." Even if we would hold the error to be structural were we to consider the issue de novo, we cannot say that as the Supreme Court has construed AEDPA the state court's contrary conclusion was unreasonable. *See Musladin*, 555 F.3d at 842–43.

## B.

Ayala claims next that, even if the trial court's exclusion of the defense was not the sort of constitutional error *in se* that requires that we presume that in every exclusion case prejudice ensues, it was prejudicial in *his* case, both in solo and when considered in conjunction with the loss of the questionnaires. In evaluating whether a trial error prejudiced a state habeas petitioner, we must apply the standard set forth in *Brecht v. Abrahamson*, determining whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). We "apply the *Brecht* test without regard for the state court's harmlessness determination." *Pulido v. Chrones*, 629 F.3d

1007, 1012 (9th Cir. 2010) (citing *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007)).**[13]**

The *Brecht* standard has been described as follows:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence.

---

**[13]** If this appeal had come before us prior to the Supreme Court's decision in *Fry*, we would have instead asked whether the state court's determination that any error was harmless under *Chapman* was contrary to, or an unreasonable application, of federal law. *See Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005). *Fry* clarified, however, that *Brecht* is the harmless error standard to be applied in such circumstances because the *Brecht* standard "subsumes" the "more liberal" § 2254(d)/*Chapman* standard. *See Fry*, 551 U.S. at 120; *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011). In other words, if a federal habeas court determines that the *Brecht* standard has been met, it also necessarily determines to be an unreasonable application of *Chapman* a state court's conclusion that the error was harmless beyond a reasonable doubt. In holding that Ayala has demonstrated his entitlement to relief under *Brecht*, we therefore also hold to be an unreasonable application of *Chapman* the California Supreme Court's conclusion that Ayala was not prejudiced by the exclusion of the defense during *Batson* steps two and three or by the loss of the questionnaires. *See Merolillo*, 663 F.3d at 458–59.

*Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011) (quoting *Kotteakos*, 328 U.S. at 765). "Where the record is so evenly balanced that a judge 'feels himself in virtual equipoise as to the harmlessness of the error' and has 'grave doubt about whether an error affected a jury [substantially and injuriously], the judge must treat the error as if it did so.'" *Id.* (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435, 437–38 (1995)) (alteration in original) (internal quotations omitted).[14]

---

[14] The dissent contends that *Brecht* no longer provides the proper standard of review for assessing prejudice, arguing instead that a writ may issue only if we determine that "no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his *Batson* claim." Dissent at 99–100. The dissent's only authority for its conclusion is *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011), which the dissent suggests refined the *Brecht* test. Dissent at 99–100.

The dissent clearly errs in applying *Richter* to prejudice analysis under AEDPA. In *Fry*, 551 U.S. 112, the Supreme Court held that *Brecht* is the proper test for prejudice analysis under AEDPA. In *Richter*, handed down just four years later, the Supreme Court did not once mention *Fry* or *Brecht*. Furthermore, the Court's reference to "fairminded jurist" was *not* in the context of reviewing a state court's prejudice determination but rather in the context of whether a state court's determination regarding constitutional error was unreasonable. 131 S. Ct. at 785. (Here, as explained *supra*, the state court was silent on the question of error, and thus only prejudice is at issue.) The dissent thus seems willing to conclude that the Supreme Court radically changed *Brecht*, a nearly two-decade old precedent — a case with central import in virtually all federal habeas adjudication, reaffirmed just five years ago in *Fry* — without even a mention of that oft-cited case. There is no legal basis for the dissent's conclusion that a case cited almost 10,000 times to determine prejudice in habeas cases was sub silentio drastically overhauled in a discussion unrelated to prejudice. The dissent's reference to *Pinholster* is equally unpersuasive. In that case, as in *Richter*, the Court did not use the language "fairminded jurist" in reviewing a state court's prejudice determination. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1408 (2011).

We conclude that Ayala has met the *Brecht* standard. The prejudice he suffered was the deprivation of the opportunity to develop, present, and likely prevail on his *Batson* claim. Had he prevailed on that claim, and shown that the prosecution acted upon impermissible considerations of race in striking even one of the seven black or Hispanic jurors it struck, then, as the state acknowledged in oral argument before this court, we would be compelled to reverse Ayala's conviction because his entire trial would have been infected by this violation of the Constitution. *See Vasquez v. Hillery*, 474 U.S. 254, 263–64 (1986); *Boyd*, 467 F.3d at 1150. The question, then, is whether Ayala could have made this

---

Furthermore, because *Richter* and *Pinholster* were ineffective assistance of counsel cases, the Court had no reason to apply *Brecht*. *Strickland*, not *Brecht*, provides the proper prejudice standard for ineffective assistance of counsel claims. *See Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) ("[W]here a habeas petition governed by AEDPA alleges ineffective assistance of counsel under [*Strickland*], we apply *Strickland's* prejudice standard and do not engage in a separate analysis applying the *Brecht* standard.").

Additionally, in the thirty months since *Richter* was handed down, we have repeatedly applied the traditional *Brecht* test to assess prejudice in habeas cases. *E.g.*, *Merolillo*, 663 F.3d at 454; *Ybarra v. McDaniel*, 656 F.3d 984, 995 (9th Cir. 2011); *United States v. Rodrigues*, 678 F.3d 693, 695 (9th Cir. 2012). In some cases, we have cited *Richter* in analyzing constitutional error but then, properly, applied the traditional *Brecht* test when determining prejudice. *E.g.*, *Ocampo v. Vail*, 649 F.3d 1098, 1106 (9th Cir. 2011); *Schneider v. McDaniel*, 674 F.3d 1144, 1149–50 (9th Cir. 2012). Thus, even if we believed that the dissent were correct that *Richter* rewrote the test for prejudice (a conclusion that is wholly without support and that we unequivocally reject), this three-judge court, like all others, is nevertheless required to apply *Brecht* as it was (and is), because such is the law of the circuit. Lacking support in both Supreme Court and Ninth Circuit case law, the dissent's pronouncement simply amounts to a preference that the prejudice standard under AEDPA should be far more onerous than current law provides.

showing but for the state's constitutional errors. If we cannot say that the exclusion of defense counsel with or without the loss of the questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim, then we must grant the writ.

Here, it is probable that the state's errors precluded Ayala from turning what is a very plausible *Batson* claim — the challenge to the prosecution's strikes of all minority jurors — into a winning one by preventing defense counsel from performing the two "crucial functions" we identified in *Thompson*. First, Ayala's counsel could have pointed out where the prosecution's purported justifications might be pretextual or indicate bad faith. Although the trial judge may have been able to "detect some of these deficiencies by himself, . . . there might be arguments [he] would overlook" because he was "unassisted by an advocate." *Thompson*, 827 F.2d at 1260–61. The jury selection process took over three months and comprises more than six thousand pages of the record. The trial judge, attempting to evaluate the prosecution's reasons for striking the jurors in light of this massive amount of information, was almost certain to forget or overlook key facts, but could have been substantially aided by the presence of participants in the process adverse to the prosecution. In particular, Ayala's lawyers could have pointed out when the prosecutor's proffered reason for striking a black or Hispanic juror applied "just as well to an otherwise-similar nonblack [or non-Hispanic] who [was] permitted to serve." *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005). The Supreme Court has emphasized the importance of this sort of "comparative juror analysis" to determining whether a prosecutor's reasons for challenging a minority juror were pretextual. *Id*.; *see also Snyder v. Louisiana*, 552 U.S. 472, 483–85 (2008). Although Ayala can — and does — still raise some of these arguments on appeal, he was

deprived of the crucial opportunity to present them to the institutional actor best positioned to evaluate them. As the Supreme Court has observed, appellate courts must accord deference to "trial court findings on the issue of discriminatory intent" because "the finding largely will turn on evaluation of credibility." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (quoting *Hernandez v. New York*, 500 U.S. 352, 366 (1991) (plurality opinion)) (internal quotation marks and citations omitted). Because, after finding a prima facie case of a *Batson* violation, the trial court was not made aware of key facts that could have influenced its credibility determination, there is substantial reason to doubt that Ayala's *Batson* challenge was properly denied.

Second, Ayala's counsel could have "preserve[d] for the record, and possible appeal, crucial facts bearing on the judge's decision." *Thompson*, 827 F.2d at 1261. We cannot know many of the facts material to whether the prosecution's stated reasons were false, discriminatory, or pretextual because defense counsel was not able to preserve relevant facts regarding prospective jurors' physical appearances, behavior, or other characteristics. Although the trial judge could have been aware of these facts, an appellate court "can only serve [its] function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after learning of the prosecutor's reasons." *Id.*; *see also United States v. Alcantar*, 897 F.2d 436, 438 (9th Cir. 1990) (reversing a defendant's conviction where the *Batson* proceedings conducted below left the defense unable "to adequately challenge the prosecution's reasons as pretextual" and left the reviewing court uncertain as to whether the prosecution had, in fact, violated *Batson*).

This second deficiency is greatly augmented by the loss of the jury questionnaires. The only questionnaires that have been preserved are those of the seated and alternate jurors.[15] We are unable to evaluate the legitimacy of some of the prosecution's proffered reasons for striking the black and Hispanic jurors because they referred to questionnaires that are now lost. The loss of the questionnaires also leaves us lacking potentially crucial information about certain individuals who were neither the subject of Ayala's *Batson* challenge nor ultimately served as jurors.[16] Thus, we cannot perform a fair comparative juror analysis as required by *Batson*. *See Miller-El v. Dretke*, 545 U.S. at 241.

Even so, we have substantial reason to question the motivation of the prosecution in engaging in its peremptory challenges of the black and Hispanic jurors. In conducting our inquiry, we must keep in mind the strength of Ayala's prima facie case. "[T]he statistical evidence alone raises some debate as to whether the prosecution acted with a

---

[15] There are also three other questionnaires out of more than 200 which were somehow located, but have no particular significance with respect to a comparative juror analysis.

[16] The state and the dissent both appear to presume that the only relevant comparisons in a comparative juror analysis are between the struck jurors and the jurors who are ultimately seated, but *Miller-El* made clear that the otherwise-similar jurors to whom the struck jurors can be compared include those "permitted to serve" by the prosecution but ultimately struck by the defense. *See, e.g.*, *Miller-El v. Dretke*, 545 U.S. at 244–45 (comparing a struck juror to a juror not challenged by the prosecution who was later challenged by the defense). This, of course, makes perfect sense: some of these jurors were not struck by the defense until after the prosecution had passed them for several rounds, and the "underlying question is not what the defense thought about these jurors," but what the prosecution did. *Id.* at 245 n.4.

race-based reason when striking prospective jurors."
*Miller-El v. Cockrell*, 537 U.S. at 342. That the prosecution
struck each of the seven black or Hispanic jurors available for
challenge establishes a basis for significant doubt of its
motives: "[h]appenstance is unlikely to produce this
disparity." *Id.*

Perhaps more important, the analysis of the prosecution's
motives that is possible on the partial record before us
demonstrates that many of its stated reasons for striking the
seven black and Hispanic jurors were or may have been false,
discriminatory, or pretextual. There are good reasons to think
that race motivated the prosecution's strikes of at least three,
if not more, jurors: Olanders D., Gerardo O. and Robert M.[17]

---

[17] Although the record provides somewhat less reason to conclude that
the prosecution's justifications for the strikes of the four other black and
Hispanic jurors were pretextual, race may also have played a substantial
role in these challenges. For example, Ayala might have been able to
show that the prosecution violated *Batson* when it struck Hispanic juror
George S. in the final round of peremptory challenges. The prosecution
gave five reasons for striking George S. The first reason — that his
application to be a police officer some twenty years earlier had been
rejected — applied equally to seated white juror Charles C. The second
reason — that he had indicated some discomfort with the death penalty —
did not significantly distinguish him from a number of seated white jurors.
*See infra* Section V.B.2. The third reason — that he had been a "holdout"
on a prior jury — could have been called into question had defense
counsel been able to point out that the jury on which George S. had been
a "holdout" was a civil one, that the issue in dispute had been the
assessment of damages, and that unanimity was not required. The fourth
reason — that he had written in his questionnaire that the parties probably
would not want him to serve as a juror — overlapped entirely with the
third reason, as George S. had explained that he wrote that the parties
might not want him as a juror because he had been a civil jury "holdout."
The fifth and final reason — that he placed excessive emphasis on the
Bible in his questionnaire — cannot be evaluated at all because the

We "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole," *Kotteakos*, 328 U.S. at 765, that Ayala was not prevented from showing that the prosecution struck at least one of these jurors because of his race.

### 1. Olanders D.

Olanders D. was one of two black jurors whom the prosecution struck in the first round of peremptory challenges. During the in camera hearing that followed the defense's *Batson* motion, the prosecutor explained that he struck Olanders D. because: (1) he might not be able to vote for the death penalty, as he had written in his questionnaire that he did not believe in it, and he had indicated in questioning that his view had recently changed; (2) his answers to voir dire questions often were not fully responsive; (3) his questionnaire responses had been "poor"; and (4) he might lack the "ability to fit in with a cohesive group of 12 people." The trial judge rejected one of the four proffered reasons — his purported inability "to fit in with a cohesive group of 12 people." The presence of defense counsel, and the preservation of the questionnaires, could have permitted Ayala to call into question all three of the reasons that the court accepted as legitimate.

First, in response to the prosecution's claim that it was concerned that Olanders D. would hesitate to impose the death penalty, defense counsel could have pointed to seated white jurors who had expressed similar or greater hesitancy. One seated juror in particular was indistinguishable from

---

questionnaire has been lost, along with those of others whom the prosecutor might have passed.

Olanders D. in this regard. Olanders D. had (apparently) written in his questionnaire that he did not believe in the death penalty. Ana L., a seated white juror, made almost precisely the same statement in her questionnaire, writing that she "probably would not be able to vote for the death penalty." Also, Olanders D. later said during voir dire that he had reconsidered his views, and affirmed that he could be "personally responsible for being on a jury and actually voting for the death penalty." Once again, Ana L. said almost precisely the same thing: she stated that she had since rethought her position, and affirmed that she could "actually vote" for the death penalty.[18]

Second, in answer to the prosecution's purported concern that Olanders D.'s answers on voir dire were not always fully responsive, defense counsel could have questioned the validity of this assessment, suggested that his answers were in fact fully responsive, and pointed to seated white jurors whose answers were less responsive than Olanders D.'s. Our review of the voir dire transcript reveals nothing that supports the prosecution's claim: Olanders D.'s answers were responsive and complete. In order to make this fact clear to the trial judge, defense counsel could once again have compared Olanders D. to seated juror Ana L. Ana L. had, for example, responded "That is correct" to a question asking "why" she would prefer not to sit as a juror, stared blankly at defense counsel in response to a question on the presumption

---

[18] Other seated white jurors to whom defense counsel could have pointed in order to show to be pretextual the prosecution's stated concern that Olanders D. would not be willing to impose the death penalty include Dorothy C., Dorothea L., Dorothy H. and Leona B. *See infra* Section V.B.2.

of innocence, and failed, at various points, to respond directly
to yes or no questions.

Third, we cannot know exactly what arguments defense
counsel could have made to undermine the prosecution's final
reason for striking Olanders D. — that his questionnaire
responses were "poor," and demonstrated his inability to
express himself.  Because Olanders D.'s questionnaire has
been lost, we may only speculate as to its contents.  If the
reason his answers were "poor" was that they were not
particularly detailed, the defense could have compared his
questionnaire to that of Ana L., whose answers were brief and
often incomplete, or to that of Charles G., a seated white juror
whose responses to the 77 questions were rarely longer than
two or three words apiece.  If the reason his answers were
poor was that they reflected an inability to think clearly or
express complex thoughts, the defense could have compared
his questionnaire to that of Thomas B., a seated white juror
who, for example, opined of street gangs, "I feel the only
media coverage they get is bad, however, those whom do
constructive events usually seek out positive media
coverage."  Further, this is an obvious instance in which the
defense is prejudiced by being unable to compare Olanders
D.'s answers to those of prospective white jurors who were
accepted by the prosecution but struck by the defense, and
whose questionnaires have been lost.[19]  It is also, of course,

---

[19] For example, Elizabeth S., who was in all likelihood white, was seated
as an alternate on a panel accepted by the prosecution — which never used
its sixth and final peremptory challenge in the selection of the alternate
jurors — but was later struck by the defense.  Her questionnaire, which
was lost, might have been particularly valuable to Ayala for comparative
juror analysis if her written responses were anything like those she
delivered during voir dire.  Consider the following exchange between the
trial court and Elizabeth S.:

possible that Olanders D.'s answers were not poor at all. We have no way of knowing.

Thus, one of the four reasons given by the prosecution for striking this prospective juror was determined to be without merit by the trial judge; two failed to distinguish the juror whatsoever from at least one seated white juror; and the fourth and final reason the prosecution gave for striking the juror cannot be evaluated because his questionnaire was lost, as were those of the prospective white jurors struck by the defense. Given the objective reasons that we have even on this record to question the validity of the prosecution's explanations for striking Olanders D., we simply cannot conclude that it is likely that, if the defense had been present

---

> Q: Did you have an opportunity to review the summary of legal issues and preliminary questions? This was a packet of material in the juror's lounge.
>
> A: No.
>
> Q: You didn't read it?
>
> A. Not today. I read the papers that they gave me in the office.
>
> Q. Today?
>
> A. Yeah.
>
> Q. Okay. That was the summary of legal issues and preliminary questions?
>
> A. Yeah, Yeah.

Perhaps because of this and similar exchanges, she was later asked if she had a hearing problem, which she did not.

during the *Batson* proceedings and if the lost questionnaires had been preserved, Ayala would not have been able to show that the prosecution's stated reasons for striking Olanders D. were pretextual, and that the actual reasons were racial.

### 2. *Gerardo O.*

Gerardo O. was one of two Hispanic jurors the prosecution challenged during the second round of peremptories. He was struck, the prosecutor explained in the subsequent ex parte proceeding, because: (1) he was "illiterate," and had needed the questionnaire to be translated for him; (2) he "appeared not to fit in with anyone else," was "standoffish," with "dress and mannerisms . . . not in keeping with the other jurors," and "did not appear to be socializing or mixing with any of the other jurors"; and (3) his voir dire responses suggested that he was not sure "if he could take someone's life," and that he "felt a little shaky as far as his responsibilities in this case." The trial judge concluded that the "record document[ed] the factors that were indicated" by the prosecutor and accepted his explanation.

Once again, had the defense not been excluded from the *Batson* proceedings, it likely could have called into question all of the prosecution's stated reasons for striking Gerardo O. Defense counsel could have first argued that one reason given — that Gerardo O. was illiterate — was itself indicative of the prosecution's discriminatory intent. Although Gerardo O. did need someone to fill out the questionnaire for him, the record reveals that he was not, in fact, illiterate, but simply had difficulty writing in English. Gerardo O. had been born in Mexico and was not a native English speaker, but he had graduated from high school and attended college in the United States, and was perfectly capable of reading the

summary of legal issues that was given to prospective jurors before voir dire questioning.  As he explained at voir dire, he did not fill out the questionnaire himself because he was concerned about his English spelling.  The prosecution's purported reason for striking Gerardo O., then, was directly related to his status as someone who spoke Spanish as his first language.  Thus, as the Supreme Court observed in a similar circumstance, "the prosecutor's frank admission that his ground for excusing th[is] juror[] related to [his] ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact [was a] race-based peremptory challenge[]." *Hernandez*, 500 U.S. at 363 (plurality opinion).  Defense counsel's presence was necessary to point out the potential inferences to the trial judge and urge the judge to adopt the one most appropriate here.

An inference of racial bias might also have been drawn from the prosecutor's claim that Gerardo O. was challenged because he did not dress or act like other jurors, and did not mix or socialize with them.  It is likely that Gerardo O.'s dress and mannerisms were distinctly Hispanic.  Perhaps in the late 1980s Hispanic males in San Diego County were more likely than members of other racial or ethnic groups in the area to wear a particular style or color of shirt, and Gerardo O. was wearing such a shirt (and for this reason did not "fit in," in the prosecutor's mind, with the other jurors). If so, and if defense counsel were able to bring this fact to the trial court's attention, the prosecution's explanation that it struck Gerardo O. because of his dress and mannerisms would provide compelling support for Ayala's claim that the strike was actually racially-motivated.  *See id.*  ("[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true,

that the [classification] bears more heavily on one race than another.") (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)). If present at the hearing, defense counsel could have made a record that would have strongly supported these claims.

Even if Gerardo O.'s clothes and behavior were in no way correlated with his race, defense counsel might have been able to show the prosecution's explanation to be pretextual. Defense counsel might have pointed to other jurors the prosecution had not struck who had similar characteristics — perhaps, for example, a seated white juror had actually worn an outfit identical to Gerardo O.'s. Defense counsel might also have been able to challenge the factual basis for the prosecution's claim — perhaps, unbeknownst to the trial judge, Gerardo O. did "socializ[e] or mix[]" with a number of other jurors, and had even organized a dinner for some of them at his favorite Mexican restaurant.

We can only speculate as to whether or how Ayala could have shown this explanation for striking Gerardo O. to be facially discriminatory, false or pretextual because we know nothing about his dress or mannerisms, or that of the other prospective jurors. These are exactly the sort of physical and behavioral observations that the defense could have preserved for the record had it been permitted to hear and respond to the prosecution's explanations for challenging Gerardo O. Although we might hope that the trial judge would have noticed if Gerard O. had been wearing a shirt worn only by members of the Hispanic community, or had been dressed identically to other prospective jurors whom the prosecution had not challenged, or had in fact been socializing with other jurors, "we cannot affirm simply because we are confident he

must have known what he was doing." *Thompson*, 827 F.2d at 1261.

Finally, in response to the prosecution's third reason for the strike — that Gerardo O. seemed reluctant to impose the death penalty — defense counsel could have demonstrated this reason to be pretextual through comparisons to jurors the prosecution did not strike. Gerardo O. had stated during voir dire that "I'm not sure if I can take someone's life in my hand and say . . . you know, 'death,' or something," but he soon thereafter affirmed that he "could vote for the death penalty." This statement was indistinguishable from those made by a number of seated white jurors. Dorothy C. said in voir dire that serving as a juror in a capital case would cause her to "worry a lot" because it was "a lot of responsibility," gasped when defense counsel told her that as a juror she would "decide the sentence," and stated, "I've never had to vote on a death penalty. That might be a little bit difficult when it came right down to it, but I'd say I'm for it." Likewise, Dorothy H., when asked in voir dire if she could return a verdict of death, stated, "I don't think it would be an easy thing for anyone, but I don't — I think I could do it if I felt it was the thing to do." Dorothea L. was even more hesitant, saying, when asked the same question, "I think so, but I don't know until I have to do it." Finally, Leona B., when asked by the prosecutor if having the responsibility for imposing the death penalty would "bother" her, responded, "Yes, I think so. I think — I think one should be affected . . . by that. I don't think it's anything to be taken lightly." Certainly, Gerardo O. expressed less hesitancy than Ana L., who had flatly stated on her questionnaire that she "probably would not be able to vote for the death penalty" before subsequently changing her mind. Further, prospective white jurors accepted by the prosecution but struck by the defense might

have expressed similar sentiments in their jury questionnaires. We cannot tell, because these questionnaires have been lost.

Thus, one of the reasons given by the prosecution for striking this prospective juror could have itself given rise to an inference of discriminatory intent. A second reason cannot be evaluated because defense counsel was excluded from the *Batson* proceedings and could not preserve for the record certain crucial facts. The third reason given failed to distinguish Gerardo O. from seated white jurors the prosecutor chose not to strike, as well as, possibly, from other prospective white jurors struck not by the prosecution but by the defense. Given the cause we have to question the validity of the prosecution's reasons that can be evaluated on this record, we cannot say that Ayala would not have shown that the trial court would or should have determined that the prosecution's strike of Gerardo O. violated *Batson*.

### 3. Robert M.

The prosecution struck Hispanic juror Robert M. in the final round of peremptory challenges. In camera, the prosecutor explained that he had been concerned, given Robert M.'s response to voir dire questioning, that he might not be willing to impose the death penalty. This concern had been heightened by Robert M.'s mentioning the Sagon Penn case — a case in which the defendant was found not guilty in a second trial and the police and the district attorney's office were accused of misconduct. The trial judge accepted the prosecution's explanation, stating that, although Martinez's "questionnaire would tend to indicate a person that is certainly pro the death penalty[,] . . . his answers varied

somewhat to the extent that individually, there may well be a legitimate concern as to whether or not he could impose it."

Defense counsel's presence in the *Batson* proceedings was necessary to call into question the prosecution's claim that it struck Robert M. because of his reluctance to impose the death penalty. Even without comparing Robert M. to other jurors permitted to serve, this explanation is highly suspect: Robert M. repeatedly stated during voir dire that he believed in the death penalty and could personally vote to impose it, and his questionnaire (which has, of course, been lost) manifested a similar enthusiasm according to the trial judge. Defense counsel could have brought to the trial court's attention that the only statement potentially raising any question whatsoever — that voting for a death sentence might "weigh on his conscience," and would be a "heavy" decision — was indistinguishable from a practical standpoint from statements by Dorothy C., who said that serving as juror in a capital case was "a lot of responsibility" and would cause her to "worry a lot," Dorothy H., who stated that imposing the death penalty would not "be an easy thing for anyone," Dorothea L., who said she would not know if she could impose the death penalty until she had to do it, and Leona B., who affirmed that this responsibility would "bother" her. Other prospective jurors who were struck by the defense, but had been accepted by the prosecution, may have made comparable statements in their questionnaires (which, again, have been lost). Counsel could have argued that most jurors who believed in imposing the death penalty would consider a decision to do so a "heavy" decision that would weigh on one's conscience. Following counsel's argument, the judge might well have recognized that there is indeed rarely a "heavier" decision a citizen is ever asked to undertake. Certainly, like Gerardo O., Robert M. was no more hesitant

than Ana L., who had actually at one point stated that she would be unable to impose the death penalty.

To the extent that the prosecution gave Robert M.'s reference to the Sagon Penn case as a separate reason for its challenge, defense counsel could likely have demonstrated that this reason was pretextual. First, the entirety of the Sagon Penn exchange was as follows:

> **Prosecutor:** Have you followed any kind of — any court cases in the news or come downtown to watch any trials?
>
> **Robert M.:** Well, I followed the Saigon [sic] Penn case.
>
> **Prosecutor:** All right.

Robert M. briefly mentioned the case in response to the prosecution's question, and he said nothing about any accusations of police or prosecutorial misconduct.

Second, although none of the seated jurors had been asked a similar question, one seated white juror had on his own initiative referred to a far more controversial capital case. When asked to describe his feelings about the death penalty, Douglas S. mentioned the "Harris" case, saying: "The Harris case, which goes back . . . . I believe he's on death row . . . I can't even recall the exact crimes, but I remember them to be quite bizarre, and — and here he was, facing execution, and I don't know." Douglas S. was presumably referring to Robert Alton Harris, who at the time of Ayala's trial was on California's death row, and had, in a case that was extensively covered by the press, been tried, convicted and

sentenced to death in San Diego. *People v. Harris*, 623 P.2d 240, 246 (Cal. 1981). As Harris's case wound its way through the state and federal courts, it generated substantial controversy, some of which, as in the Sagon Penn case, was related to allegations of official misconduct. *See, e.g., id.* at 267 (Bird, C.J., dissenting) (arguing that Harris had been denied his right to a fair trial due to extensive and prejudicial pretrial publicity, partially the product of the "sorry spectacle of prosecutorial offices publicly vying with each other to have 'first crack' at convicting the accused"); *see also* Stephen R. Reinhardt, The Supreme Court, The Death Penalty, and The *Harris* Case, 102 Yale L.J. 205, 205 & n.1 (1992) (for further description of controversy generated by case). Douglas S.'s statement about the case — "here he was, facing execution, and I don't know" — suggests that this controversy had created some doubt in his mind as to the propriety of Harris's conviction and sentence. Certainly, Douglas S.'s unelicited discussion of the Harris case should have troubled the prosecutor far more than Robert M.'s brief direct response regarding the Sagon Penn case.

Finally, if there was any inference to draw from Robert M.'s fleeting reference to the Sagon Penn case, it was that Robert M. would not return a guilty verdict based on a blind trust of the police and the prosecution who had arrested and charged the defendant with the crime. Numerous seated white jurors expressed similar sentiments. Douglas S., for example, stated that the last person who had lied to his face was a California policeman. Similarly, Charles C. said, "You don't change your stripes . . . when you put on a badge; and you have to judge everybody's testimony in a court case on its face."

Even if the trial judge had not been willing to completely reject the prosecution's implausible explanation that it struck Robert M. because he mentioned the Sagon Penn case, there is a strong likelihood that, had defense counsel been present and been able to persuade the court that the prosecution's principal reason for challenging this juror — his reluctance to impose the death penalty — was pretextual, the court would have concluded that the strike violated *Batson.* We thus cannot conclude that the exclusion of defense counsel from the *Batson* proceedings did not prevent Ayala from showing that the prosecution's strike of Robert M. was based on its impermissible consideration of race.

*     *     *

Although each of the reasons offered by the prosecution for challenging the black and Hispanic jurors discussed above could have been shown to be pretextual had defense counsel been allowed to participate at steps two and three of the *Batson* proceedings, it is not necessary that all of the reasons advanced by the prosecution be pretextual or be shown to be pretextual. Notwithstanding the existence of some apparently appropriate reasons, "if a review of the record undermines . . . *many* of the proffered reasons, the reasons may be deemed a pretext for racial discrimination." *Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) (en banc) (quoting *Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003)) (emphasis added). In short, "[a] court need not find all nonracial reasons pretextual in order to find racial discrimination" with respect to any particular juror, and the exclusion of any one juror in violation of *Batson* requires reversal of the verdict. *Id.*

## C.

Because the defense was excluded from the *Batson* proceedings, it could not bring necessary facts and arguments to the attention of the trial judge, the institutional actor best positioned to evaluate the prosecution's credibility and to determine if its proffered reasons for striking the minority jurors were its actual and legitimate reasons. Furthermore, because the defense was excluded from the *Batson* proceedings, the appellate courts reviewing this case cannot engage in a proper comparative juror analysis, or know what other facts and arguments might be employed to demonstrate that the proffered reasons were false, facially discriminatory, and pretextual. The latter form of prejudice was exacerbated when the vast majority of the juror questionnaires were lost.

Even on this deficient record, Ayala's *Batson* claim is compelling: the prosecution struck all seven of the black and Hispanic jurors in a position to serve on the jury, and many of its proffered race-neutral reasons are highly implausible. Given the strength of Ayala's prima facie case, the evidence that the prosecution's proffered reasons were false or discriminatory, and the inferences that can be drawn from the available comparative juror analysis, it is "impossible to conclude that [Ayala's] substantial rights were not affected" by the exclusion of defense counsel from the *Batson* proceedings. *Kotteakos*, 328 U.S. at 765. Ayala has suffered prejudice under *Brecht*, and is entitled to relief. When that demonstration of prejudice is supplemented by the state's loss of the juror questionnaires, the case for prejudice under *Brecht* is even more clear.

## V.

Although our conclusions in Parts III and IV — that the state court committed federal constitutional error that prejudiced Ayala under the *Brecht* standard — would dictate that he be granted habeas relief, we may not grant such relief if, as the state asserts, and the district court agreed, Ayala's claim (specifically his exclusion from stages two and three of the *Batson* proceedings) is barred by *Teague v. Lane*, 489 U.S. 288 (1989). "[I]n addition to performing any analysis required by AEDPA, a federal court considering a habeas petition must conduct a threshold *Teague* analysis when the issue is properly raised by the state." *Horn v. Banks*, 536 U.S. 266, 272 (2002).

Under *Teague*, a "new constitutional rule[] of criminal procedure" cannot be applied retroactively to cases on collateral review. 489 U.S. at 310 (plurality opinion). Thus, "[b]efore a state prisoner may upset his state conviction or sentence on federal collateral review, he must demonstrate as a threshold matter that the court-made rule of which he seeks the benefit is not 'new,'" but had been established at the time his conviction became final. *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). "A holding constitutes a 'new rule' within the meaning of *Teague* if it 'breaks new ground,' 'imposes a new obligation on the States or the Federal Government,' or was not '*dictated* by precedent existing at the time the defendant's conviction became final.'" *Graham v. Collins*, 506 U.S. 461, 467 (1993) (quoting *Teague*, 489 U.S. at 301).[20]

---

[20] *Teague* is subject to two exceptions. *See Saffle v. Parks*, 494 U.S. 484, 494–95 (1990) (a "new rule" can be applied retroactively on collateral review if "the rule places a class of private conduct beyond the

We hold that Ayala's claim does not require the retroactive application of a new constitutional rule of criminal procedure, and thus is not *Teague*-barred. At the time Ayala's conviction became final on May 14, 2001, it was established that defense counsel must be permitted to be present and offer argument during *Batson* steps two and three when, as in Ayala's case, the proceedings do not require the prosecution to reveal confidential information or trial strategy.

## A.

In this Circuit, this rule was unequivocally "dictated by precedent," *Teague*, 489 U.S. at 301 (emphasis omitted), long before Ayala's conviction became final, having been established in *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987). In *Thompson*, we held that a district court had made a constitutional error when, after the defendant had established a prima facie case under *Batson*, the court permitted the prosecution to state the reasons for its peremptory strikes ex parte. Observing that *Batson* step two might sometimes require the prosecutor to "reveal confidential matters of tactics and strategy," we recognized that in some circumstances there might be "compelling" reasons to conduct the proceedings ex parte. *Id.* at 1258–59. We therefore declined to adopt an absolute rule holding that the defense must *always* be permitted to participate at *Batson* steps two and three. We held, however, that defense counsel must be permitted to be present and offer argument during

---

power of the State to proscribe," or if it constitutes a "'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding") (quoting *Teague*, 489 U.S. at 311). Neither party contends that either exception is applicable in this case.

*Batson* steps two and three if the prosecution's proffered race-neutral reasons do not involve confidential or strategic information. *Id.* at 1258–59.[21]

Our decision in *Thompson* represented the straightforward application of two lines of Supreme Court precedent. The first line of precedent finds its source in the Sixth Amendment's guarantee of the right to counsel. Because "the plain wording of" the Amendment "encompasses counsel's assistance whenever necessary to assure a meaningful 'defence,'" the Court has long held that the right applies at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 224–25 (1967); *see also, e.g.*, *White v. Maryland*, 373 U.S. 59, 60 (1963); *Gideon v. Wainwright*, 372 U.S. 335, 345 (1963). Ultimately, the right to counsel "has been accorded . . . 'not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial.'" *Mickens*, 535 U.S. at 166 (quoting *Cronic*, 466 U.S. at 658). Foremost among the attributes of a fair trial is the requirement that it be adversarial in nature: "[t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case

---

[21] The dissent suggests that, because *Thompson* recognized the need for "occasional departures" from the rule regarding the exclusion of defense counsel from *Batson* steps two and three, *Thompson*, 827 F.2d at 1258, its conclusion was "not [] a clear rule of constitutional law." Dissent at 79. We are puzzled by this, as many constitutional rules recognize exceptions — e.g., the exigency exception to the Fourth Amendment prohibition on warrantless searches, and the public safety exception to *Miranda* — but that does not make the rules any less clear.

to survive the crucible of meaningful adversarial testing."
*Cronic*, 466 U.S. at 656. As we observed in *Thompson*,
"[t]he right of a criminal defendant to an adversary
proceeding is fundamental to our system of justice," and thus
ex parte proceedings are justifiable only as "uneasy
compromises with some overriding necessity." 827 F.2d at
1258.

*Batson* is the seminal case in the second line of precedent.
After setting out the three-stage framework used to determine
whether the prosecution has engaged in purposeful racial
discrimination in the selection of a jury, the *Batson* Court
declined "to formulate particular procedures to be followed
upon a defendant's timely objection to a prosecutor's
challenges." 476 U.S. at 99. *Batson* made clear, however,
that the defendant bears the ultimate burden of persuasion.
*Id.* at 98. *Batson* also made clear that a court must consider
"all relevant circumstances" in deciding whether a defendant
has met his burden of persuasion — an inquiry that requires
determining whether a prosecutor's stated reasons for striking
a particular juror are race-neutral, and, if race-neutral,
whether they are his actual reasons. *Id.* at 96–99; *see
Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

In *Thompson*, we recognized that the *Batson* framework
leaves defense counsel with "two crucial functions" that it
must be permitted to perform. 827 F.2d at 1260. The first
function is "to point out to the district judge where the
government's stated reason may indicate bad faith." *Id.* As
we explained:

> For example, government counsel here
> excluded one of the jurors because he lived in
> defendant's neighborhood and wore jeans to

court. This seems like a legitimate reason, unless a nonexcluded juror also wore jeans or other casual dress, or lived in the same neighborhood as the defendant. . . . [D]efense counsel might have been able to point out that the stated reasons were pretextual because others similarly situated were allowed to serve. In addition, defense counsel might have been able to argue that the reasons advanced by the prosecution were legally improper. . . . Of course, the district judge might be able to detect some of these deficiencies by himself, but that is not his normal role under our system of justice.

*Id.* The second function is to "preserve for the record, and possible appeal, crucial facts bearing on the judge's decision." *Id.* at 1261. As we reasoned in *Thompson*:

All we have before us concerning this issue is the prosecutor's explanation of her reasons and the district judge's ruling. . . . [I]f we are to review the district judge's decision, we cannot affirm simply because we are confident he must have known what he was doing. We can only serve our function when the record is clear as to the relevant facts, or when defense counsel fails to point out any such facts after learning of the prosecutor's reasons. . . . Here, the record's silence cannot be reassuring.

*Id.* Thus, we held, only with the presence and assistance of defense counsel can the trial judge and subsequent appellate

judges properly evaluate whether the defense has met its burden of persuasion under *Batson*. Excluding the defense from the *Batson* proceedings without some compelling justification therefore violates the Constitution. *Id.* at 1259–61.**[22]**

*Thompson* compels us to conclude that the rule Ayala seeks is not, under *Teague*, a "new" one. "[C]ircuit court holdings suffice to create a 'clearly established' rule of law under *Teague*." *Belmontes v. Woodford*, 350 F.3d 861, 884 (9th Cir. 2003) (reversed on other grounds by *Brown v. Belmontes*, 544 U.S. 945 (2005)); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., for the Court) ("With one caveat, whatever would qualify as an old rule under our *Teague* jurisprudence will constitute 'clearly established Federal law, as determined by the Supreme Court of the United States' under § 2254(d)(1). . . . The one caveat,

---

**[22]** The state and the dissent, in arguing that Ayala's claim is barred by *Teague*, cite *Lewis v. Lewis*, 321 F.3d 824 (9th Cir. 2003), a case in which we granted a habeas petitioner's *Batson* claim. In the course of some extended musings regarding the "ideal procedures under *Batson*," *id.* at 830, the *Lewis* panel observed, in a footnote, that the argument that "a court must allow defense counsel to argue" at *Batson* step three was not "clearly established law," as it "appears not to have been addressed by courts." *Id.* at 831 n.27. This passage is dicta, as the question of whether defense counsel must be permitted to argue at *Batson* step three was not "presented for review" in *Lewis*. *Barapind v. Enomoto*, 400 F.3d 744, 750–51 (9th Cir. 2005) (en banc) (per curiam). Indeed, this passage could not represent anything *but* dicta, as the *Lewis* panel could not overrule our prior decision in *Thompson*, of which it was apparently unaware. *See Miller v. Gammie*, 335 F.3d 889, 899–900 (9th Cir. 2003) (en banc) (holding that a prior panel's decision may only be overruled by a subsequent panel if the decision is "clearly irreconcilable" with a higher court's intervening ruling). *Thompson*'s holding thus unquestionably remains binding Circuit law.

as the statutory language makes clear, is that § 2254(d)(1) restricts the source of clearly established law to this Court's jurisprudence."). We have held that, as long as a rule derived from Supreme Court precedent was established in *this* Circuit when a petitioner's conviction became final, it is not a "new rule" under *Teague*. *See Belmontes*, 350 F.3d at 884; *Bell v. Hill*, 190 F.3d 1089, 1092–93 (9th Cir. 1999). "This is true even [if] other federal courts and state courts have rejected our holding." *Bell*, 190 F.3d at 1093. Because *Thompson* itself relied on the Supreme Court's right to counsel and equal protection jurisprudence, "we cannot now say that a state court would not have felt compelled by the Constitution and Supreme Court precedent" to conclude that the rule Ayala contends must be applied was not established at the time his conviction became final. *Id.*

## B.

We would hold that Ayala's claim is not *Teague*-barred even if we were free to conclude that, contrary to *Bell* and *Belmontes*, *Thompson* did not in and of itself establish that the rule Ayala seeks is not "new." Nearly every court to consider the question by the time Ayala's conviction became final had adopted the rule that we set forth in *Thompson*, concluding that defense counsel must be allowed to participate at *Batson* steps two and three except when confidential or strategic reasons justify the challenge. The Fourth, Eighth and Eleventh Circuits had all so held. *See United States v. Garrison*, 849 F.2d 103, 106 (4th Cir. 1988) ("We . . . agree with the Ninth Circuit that the important rights guaranteed by *Batson* deserve the full protection of the adversarial process except where compelling reasons requiring secrecy are shown."); *United States v. Roan Eagle*, 867 F.2d 436, 441 (8th Cir. 1989) ("[O]nce the prosecutor has

advanced his racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation."); *United States v. Gordon*, 817 F.2d 1538, 1541 (11th Cir. 1987) (remanding for an evidentiary hearing where the district court had denied the defendant's request for a hearing to rebut the government's proffered race-neutral reasons). The state courts that confronted the issue had all reached similar conclusions. *See Ayala*, 6 P.3d at 203; *Goode v. Shoukfeh*, 943 S.W.2d 441, 452 (Tex. 1997); *People v. Hameed*, 88 N.Y.2d 232, 238 (1996); *State v. Hood*, 245 Kan. 367, 378 (1989); *Gray v. State*, 317 Md. 250, 257–58 (1989); *Commonwealth v. Jackson*, 386 Pa. Super. 29, 51 (1989); *Commonwealth v. Futch*, 38 Mass. App. Ct. 174, 178 (1995); *see also Caspari v. Bohlen*, 510 U.S. 383, 395 (1994) ("[I]n the *Teague* analysis the reasonable views of state courts are entitled to consideration along with those of federal courts.").

These courts adopted the *Thompson* rule with good reason. The Sixth Amendment provides that the defendant must be permitted to have the assistance of a trained advocate at all critical stages of the proceedings in order to test and challenge all aspects of the prosecution's case. *See Cronic*, 466 U.S. at 656. *Batson* did not suggest that there should be an *exception* to this overarching rule when a defendant has established a prima facie case that the prosecutor has struck jurors on the basis of race. To the contrary, it makes no sense to put the burden of persuasion on the defense, as *Batson* does, and then refuse defense counsel the opportunity to hear and respond to the prosecution's explanations. The rule Ayala seeks is not in any sense new, but rather one which, as almost all courts to have considered the question have concluded, follows directly from the more general rule that the defendant has the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Id.*;

*see also Wright v. West*, 505 U.S. 277, 308–09 (1992) (Kennedy, J., concurring in the judgment) ("Where the beginning point is a rule of . . . general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.").

The state and the dissent call our attention to two decisions that reached a contrary conclusion, both of which were decided soon after the Court issued *Batson*. In *United States v. Davis*, the Sixth Circuit rejected a defendant's argument that his right to be present had been violated when the trial court allowed the prosecution to explain its peremptory strikes in camera, holding that "the district court was entitled to hear from the Government under whatever circumstances the district court felt appropriate." 809 F.2d 1194, 1202 (6th Cir. 1987). Similarly, in *United States v. Tucker*, the Seventh Circuit held that the Sixth Circuit was correct to conclude that "*Batson* neither requires rebuttal of the government's reasons by the defense, nor does it forbid a district court to hold an adversarial hearing." 836 F.2d 334, 340 (7th Cir. 1988).[23]

---

[23] The state and the dissent also cite a third decision that they contend demonstrates that there is a Circuit split that precludes our finding that the rule Ayala seeks was "dictated by precedent." In *Majid v. Portuondo*, where the issue was whether the defense had the right to cross-examine witnesses at a *Batson* hearing, the Second Circuit remarked gratuitously that "[i]t remains at least arguable that courts holding *Batson* hearings may . . . hear the [prosecution's] explanations *in camera* and outside the presence of the defendants." 428 F.3d 112, 128 (2d. Cir. 2005). The question of whether a challenge to the type of in camera hearing conducted in Ayala's case is *Teague*-barred was not, however, before the court. Moreover, this passage in *Majid* can be understood as observing

These decisions do not render Ayala's claim *Teague*-barred. "[T]he standard for determining when a case establishes a new rule is 'objective,' and the mere existence of conflicting authority does not necessarily mean a rule is new." *Williams*, 529 U.S. at 410 (quoting *Wright*, 505 U.S. at 304 (1992) (O'Connor, J., concurring in the judgment)). To the extent that these decisions deny that there is any right to participate in *Batson* proceedings, they simply cannot be reconciled with the basic Sixth Amendment requirement that, at all critical stages of criminal proceedings, the defendant must have the assistance of counsel in order to subject the prosecution's case to adversarial testing. That the courts in *Davis* and *Tucker* failed to fully appreciate the relevance of this principle is understandable, as in neither case did the defendants invoke the right to counsel to support their claim: in *Davis*, the defendants asserted that the in camera hearings had violated *their* right to be present at trial, a right derived principally from the Sixth Amendment's Confrontation Clause, *see Davis*, 809 F.2d at 1200; in *Tucker*, the defendant claimed that the ex parte proceedings violated his rights to due process and to an impartial jury, *see Tucker*, 836 F.2d at 338, 340. Perhaps for this reason, the *Davis* court failed to recognize the important functions counsel serves during *Batson* steps two and three, instead concluding that once the defense had established a prima facie case of racial discrimination, its "participation was no longer necessary for the district court to make its determination." 809 F.2d at 1202. As we explained in *Thompson*, this statement is simply not true: defense counsel continues to serve the two crucial functions of bringing facts and arguments to the attention of the trial court and preserving them for the record. *Thompson*,

only that there is no *absolute* right to an adversarial proceeding, which is consistent with the rule that Ayala seeks here.

827 F.2d at 1260–61.  Likewise, the court in *Tucker* rejected the rule we adopted in *Thompson* because it concluded that *Batson* itself did not require the defense to be present during *Batson* steps two and three, and because our exception permitting ex parte proceedings in some circumstances threatened to "swallow the rule."  *See Tucker*, 836 F.2d at 338, 340.  Our rule is not, however, derived directly from *Batson*, but rather from the confluence of *Batson* and the Court's Sixth Amendment jurisprudence.  Moreover, the fact that a rule is subject to an exception — perhaps even a relatively broad exception — is not a justification for rejecting the rule altogether when the result, in those cases in which the exception does not apply, is to deprive a defendant of his constitutional rights.[24]

Even assuming some doubt may have existed as to whether the rule Ayala seeks was "dictated by precedent" in the immediate aftermath of the Sixth and Seventh Circuits' decisions in 1987 and 1988, by the time Ayala's conviction became final in 2001, 13 years later, every court to have considered the issue in the interim — state and federal — had rejected, either explicitly or implicitly, the Sixth and Seventh Circuits' view, and had adopted the *Thompson* rule.  *See Garrison*, 849 F.2d at 106; *Roan Eagle*, 867 F.2d at 441; *Ayala*, 6 P.3d at 203; *Goode*, 943 S.W.2d at 452; *Hameed*,

---

[24] *Tucker* itself may be read to recognize this point, as it did not explicitly reject our conclusion that an adversarial hearing at *Batson* steps two and three was sometimes constitutionally compelled. *Id.* at 340.  It observed that, in general, "adversarial hearings are the most appropriate method for handling most *Batson*-type challenges." *Id.*  Thus, although the *Tucker* court purported to reject *Thompson* in favor of *Davis*, the decision did not necessarily foreclose defendants from claiming that their rights had been violated by the trial court's employment of a nonadverserial *Batson* proceeding.

88 N.Y.2d at 238; *Hood*, 245 Kan. at 378; *Gray*, 317 Md. at 257–58; *Jackson*, 386 Pa. Super. at 51; *Futch*, 38 Mass. App. Ct. at 178.   The Supreme Court had also, in the interim, acknowledged a version of our rule when it observed (in dicta) that, when a prosecutor challenges a defendant's use of peremptory challenges, "[i]n the rare case in which the explanation for a challenge would entail confidential communications or reveal trial strategy, an *in camera* discussion can be arranged." *Georgia v. McCollum*, 505 U.S. 42, 58 (1992).    Thus, the California Supreme Court characterized the rule Ayala sought — the *Thompson* rule — as one that had been "almost universally recognized." *Ayala*, 6 P.3d at 203.   Given that the California Supreme Court's description is correct, the rule that Ayala would have us apply is not *Teague*-barred.[25]

---

[25] We also note that where, as here, the state court applied the rule in question on direct appeal, and determined it to be "almost universally recognized," the application of *Teague* to bar the petitioner's claims would do little to further the doctrine's purpose.   *Teague* is motivated by considerations of comity and finality. *See Teague*, 489 U.S. at 308.   Its purpose is to afford repose to the states by ensuring that criminal convictions that were valid at the time they became final will not be upset by subsequently discovered constitutional rules.   As Justice O'Connor explained, applying new rules on collateral review

> *continually* forces the States to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then existing constitutional standards.   Furthermore, as we recognized in *Engle v. Isaac*, "[s]tate courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." [456 U.S. 107, 128 n.33 (1982).]

*Id*. at 310.   Although *Teague* may still bar the application in federal habeas

Accordingly, we conclude that, at the time Ayala's conviction became final, it was established for purposes of *Teague* that defense counsel cannot be excluded from *Batson* steps two and three absent some "compelling justification" for doing so. *Thompson*, 827 F.2d at 1259–60. The California Supreme Court held that this rule was violated in Ayala's case. It found, and the state does not dispute, that "no matters of trial strategy were revealed" in the hearings at which the prosecution explained its reasons for its peremptory challenges of all the potential black and Hispanic jurors. *Ayala*, 6 P.3d at 203.[26] Thus, the exclusion of defense

---

proceedings of rules that the state courts have themselves recognized, *cf. Beard v. Banks*, 542 U.S. 406, 413 (2004), *Horn*, 536 U.S. at 272, the interests of comity and finality are obviously far less weighty when a state court has accepted a rule than when it has rejected or ignored a rule. Here, the state is not being forced to marshal resources to defend against a new and novel claim that was not recognized at the time the conviction became final; nor did it faithfully apply existing constitutional law only to have a federal court subsequently apply new constitutional commands. To the contrary, the state is challenging a rule that the California Supreme Court found to be well established and controlling at the time it affirmed Ayala's conviction on direct appeal, as well as at the time the trial court conducted its proceedings. Certainly the state court could not be "frustrated" to find that a federal court determined that it was error to exclude the defense from the *Batson* proceedings when the state court itself had held that this very same rule was "almost universally recognized" and reached the same determination itself.

[26] The dissent attempts to reframe the *Teague* analysis as follows: *Thompson* merely articulated the rule that defense counsel could not be excluded without "compelling" justification; it was not until after Ayala's conviction became final that courts recognized that the prosecutor's explanation in this case (i.e., not revealing his strategy to the defense) was "not a valid reason not to follow the norm of an adversarial proceeding." Dissent at 80.

To the contrary, *Thompson* directly addressed the government's

counsel was in violation of the Constitution, and the only remaining question as to that aspect of the case is whether the constitutional error was prejudicial.

## VI.

Our dissenting colleague makes three assertions that are fundamental to her disagreement with our opinion. All are plainly erroneous and illustrate her misunderstanding of the nature of our holding. First, the dissent suggests that, because the trial court accepted the prosecutor's rationale for striking these jurors, deference to its ruling is required under AEDPA, citing *Rice v. Collins*, 546 U.S. 333, 338–39 (2006). Dissent at 109–11. Second, and along similar lines, the dissent accuses us of failing to give the state court decision the "benefit of the doubt," citing *Felkner v. Jackson*, ___ U.S. ___, 131 S. Ct. 1305, 1307 (2011). Dissent at 119. Third, the dissent assumes that Ayala must demonstrate that the individual jurors were struck for racial reasons by "clear and convincing evidence," citing 28 U.S.C. § 2254(e)(1). Dissent at 106, 110.

---

argument that "an adversary hearing is inappropriate because the government lawyer is required to reveal confidential matters of tactics and strategy." *Thompson*, 827 F.2d at 1259. In that case, we rejected this claim as a general proposition and held that the determination of whether revealing case strategy could be a compelling justification in a particular case must be determined by examining whether the facts in that case warranted an exception to the general rule. *Id.* Rules applied on a case-by-case basis do not raise *Teague* issues. *See Wright v. West*, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring) ("If the rule in question is one which of necessity requires a case-by-case examination of the evidence, then we can tolerate a number of specific applications without saying that those applications themselves create a new rule.").

Each of these assertions assumes, incorrectly, that we are confronting an ordinary *Batson* challenge on habeas review — a challenge to the holding in a case in which defense counsel was able to present arguments to the trial court regarding racial bias, appeal that claim to the state appellate court, and subsequently seek reversal in federal court of the judgment that none of the jurors was struck by the prosecution for impermissible racially motivated reasons. *Rice* and *Felkner* are precisely such cases. The Supreme Court has emphasized, in such cases, that deference is required, that the petitioner must demonstrate his factual claims of prosecutorial bias by clear and convincing evidence, and that we may not give the petitioner the benefit-of-the-doubt with regard to the existence of racial prejudice. However, this case is not an ordinary *Batson* challenge, and for the reasons we have explained *supra* the dissent's approach is both inapplicable and wholly inappropriate. This, as the dissent consistently ignores, is a case in which the challenge is to the procedure employed by the trial court in conducting the *Batson* inquiry — a procedure that resulted in the denial of a fair *Batson* hearing to the defendant. Thus, it is not our task here to show that Ayala should have prevailed on his *Batson* claim, but only that he was prejudiced in his ability to prevail on that claim by the fact that his counsel was not present at the *Batson* hearing.

We cannot defer to the trial court where procedural error (such as the state supreme court found here and that the state concedes) has rendered the trial court's determination unreliable. Ayala's counsel was excluded from *Batson* stages two and three, thus depriving him of the opportunity to persuade the trial judge that the prosecutor was motivated by racial bias. Even a very capable trial judge may overlook or fail to understand the arguments supporting racial motivation

"if unassisted by an advocate." *Thompson*, 827 F.2d at 1261. Because the procedures designed to ensure a fair hearing to the defendant were not followed, we cannot afford deference to the trial court's determination of the merits of the *Batson* claim. As we concluded in *Thompson*, we "cannot rely on . . . such fundamentally flawed procedures to show that that defendant suffered no prejudice." *Id.* at 1261.

Next, for similar reasons, the "clear and convincing evidence" standard has no role with regard to Ayala's challenge. The dissent's position is inherently at odds with the statutory authority on which it relies. That AEDPA provision reads as follows:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). We have previously held, in interpreting § 2254(e)(1), that "the presumption of correctness and the clear-and-convincing standard of proof *only* come into play once the state court's fact-findings survive any intrinsic challenge." *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004) (emphasis added) (cited by but expressly not overruled in *Wood v. Allen*, 588 U.S. 290, 299–301 & n.1 (2010)). In *Taylor*, we explained that a state court factual finding is intrinsically flawed if "the process employed by the state court is defective," *Id.* at 999 (citing *Nunes v. Mueller*, 350 F.3d 1045, 1055–56 (9th Cir. 2003)).

Here, the state court admitted that precluding Ayala's counsel from establishing a *Batson* violation at stages two and three of the state's trial court proceeding constituted procedural error. Under *Taylor*, because the state court proceeding was flawed, it is not entitled to a presumption of correctness, and Ayala is not required to demonstrate his *Batson* claim by clear and convincing evidence. The dissent's assertion is contrary to AEDPA and to *Taylor* and would simply erect an insurmountable barrier that would protect the conceded error against any effective federal review.[27]

## VII.

We hold that the exclusion of Ayala and his counsel during *Batson* steps two and three constitutes prejudicial error. In the language of *Brecht*: we cannot say that had counsel been permitted to participate in the *Batson* proceedings, Ayala would have been unable to show that the prosecution violated *Batson*. To the contrary, constitutional error on the part of the state likely prevented Ayala from showing that the prosecution utilized its peremptory challenges in a racially discriminatory manner, and thus permitted him to be tried, convicted, and sentenced to death by a jury selected in a manner repugnant to the Constitution. Accordingly, we reverse the judgment of the district court, and remand with instructions to grant the writ and order that Ayala be released from custody unless the state elects to retry

---

[27] There is one additional error our dissenting colleague makes that is not limited to the *Batson* context but would rewrite the law of prejudice in all habeas cases. For that reason, it deserves mention here. As we have explained *supra*, the well-established *Brecht* standard governing prejudice has not been revised or modified, and the dissent's suggestion to the contrary is without merit. *See* discussion *supra* at 30–34 & nn.12–13.

him within a reasonable amount of time to be determined by the district court.

**REVERSED and REMANDED.**

CALLAHAN, Circuit Judge, dissenting:

In 1985, Hector Juan Ayala shot and killed three men. In 1989, he was convicted of three counts of murder, and the jury returned a death sentence. On direct appeal his conviction and sentence were affirmed by the California Supreme Court in 2000. *People v. Ayala*, 6 P.3d 193 (Cal. 2000). The Supreme Court of the United States denied his petition for certiorari in 2001. *Ayala v. California*, 532 U.S. 908 (2001). Ayala filed his initial petition for a writ of habeas corpus in the United States District Court for the Southern District of California in 2002. This appeal is from the district court's February 17, 2009, final order denying the petition.[1]

The majority holds, based primarily on law developed after Ayala's trial, that Ayala must be released or retried because it suspects the prosecutor might have had a racial motive in recusing seven jurors. It does so by inappropriately deconstructing the California Supreme Court's opinion to justify its evasion of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") so that it may review the state trial court's 1989 decisions *de novo*. Because Ayala's federal claim is *Teague*-barred, and because the majority's

---

[1] There does not appear to be any question that there was sufficient evidence to convict Ayala of murder. *See Ayala*, 6 P.3d at 199–201.

approach and conclusion are contrary to AEDPA and recent Supreme Court opinions, I dissent.

## I

I agree with the district court and the State that Ayala's claim that he was deprived of his constitutional rights when his attorney was not present when the prosecutor offered his reasons for the challenged recusals, is barred under *Teague v. Lane*, 489 U.S. 288 (1989).[2]

### A. The standard for determining whether a claim is barred under *Teague*.

In *Caspari v. Bohlen*, 510 U.S. 383 (1994), the Supreme Court set forth the test for determining whether a state prisoner's claim was Teague-barred:

> "[A] case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, *supra*, 489 U.S. at 301. In determining whether a state prisoner is entitled to habeas relief, a federal court should apply *Teague* by proceeding in three steps. First, the court must ascertain the date on which the defendant's conviction and sentence became final for *Teague* purposes. Second, the court must "[s]urve[y] the legal

---

[2] Because it is clear that Ayala's claims would be *Teague*-barred if reviewed *de novo*, the majority should have begun and ended with this *Teague* analysis, rather than reach the more difficult questions regarding the standard of review under 28 U.S.C. § 2254(d).

landscape as it then existed," *Graham v. Collins, supra*, 506 U.S., at 468, and "determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution," *Saffle v. Parks*, 494 U.S. 484, 488 (1990). Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle. *See Gilmore v. Taylor*, 508 U.S. 333, 345 (1993).

*Id*. at 390 (emphasis as quoted in *Caspari*).[3]

There is no dispute that Ayala's conviction became final in May 2001, when the Supreme Court denied certiorari, and Ayala does not assert that he comes within either of the two narrow exceptions. The remaining question is whether, in May 2001, the unconstitutionality of ex parte procedure used by the trial court in 1986 was "dictated" by precedent.

## B.  The evolution of *Batson* as of May 2001.

In *Batson v. Kentucky*, 476 U.S. 79, 96 (1986), the Supreme Court held that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial."

---

[3] In all quotations, the parallel citations have been omitted.

*See also Georgia v. McCollum*, 505 U.S. 42, 47 (1992). *Batson* established a three-step inquiry.  First, the defendant must make a prima facie showing that the prosecution has exercised peremptory challenges in a racially discriminatory manner.  *Batson*, 476 U.S. at 96.  The Supreme Court stated that it had "confidence that trial judges, experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."  *Id*. at 97.  Second, "[o]nce the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id*.  Third, the trial court must then "determine if the defendant has established purposeful discrimination."  *Id.* at 98.

   In setting forth this three-step standard, the Supreme Court specifically declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Id*. at 99.  The Court reiterated that "[i]n light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today." *Id*. at 99 n.24.  As a result, during the quarter of a century that has passed since *Batson*, courts have considered numerous ways of applying *Batson*'s three-step standard.

   Ayala's primary argument is that the trial court's exclusion of him and his counsel from the proceedings in which the prosecution justified its recusal of seven jurors violated his constitutional rights to assistance of counsel at critical stages of the proceedings, to be personally present, and to assist his counsel in his defense.  In response, the State

argued and the district court held that in 2001, when Ayala's conviction became final, the exclusion of Ayala and his counsel from the proceedings was not a constitutional violation, and hence, Ayala's claim was barred by *Teague*, 489 U.S. 288.

The California Supreme Court, in reviewing Ayala's direct appeal, concluded that it was "almost universally recognized that ex parte proceedings following a motion regarding peremptory challenges allegedly made on the basis of improper group bias are poor procedure and should not be conducted unless compelling reasons justify them." *Ayala*, 6 P.3d at 203.

The majority claims that in May 2001 this rule had been "unequivocally 'dictated by precedent'" as a result of our opinion in *United States v. Thompson*, 827 F.2d 1254 (9th Cir. 1987). Majority at p. 56. *Thompson* concerned a 1985 criminal trial in a federal district court. The judge alone conducted voir dire and "the government used four of its peremptory challenges to exclude all four blacks in the venire." *Id*. at 1256. When Thompson's lawyer moved for a mistrial, the district court "allowed the government to put its reasons for the disputed peremptory challenges on the record, albeit in camera and out of the presence of the defendant and his lawyer." *Id*. Thompson appealed, arguing that this procedure violated his Fifth Amendment right to due process and his Sixth Amendment right to a fair and impartial jury. *Id*. A divided panel concluded that the "district court erred in refusing to allow defense counsel in this case to hear the government's reasons for excluding the black potential jurors and to present argument thereon." *Id*. at 1261. We explained that "situations where the court acts with the benefit of only one side's presentation are uneasy

compromises with some overriding necessity, such as the need to act quickly or to keep sensitive information from the opposing party. Absent such compelling justification, ex parte proceedings are anathema in our system of justice and, in the context of a criminal trial, may amount to a denial of due process."[4] *Id*. at 1258–59.

## C. Ayala's Sixth Amendment claim was not dictated by precedent in 2001.

In *Horn v. Banks*, 536 U.S. 266, 272 (2002), the Supreme Court held that "a federal court considering a habeas petition must conduct a threshold *Teagu*e analysis when the issue is properly raised by the state," even if the state supreme court did not consider the issue. Thus, we are required to determine as a threshold matter whether Ayala's claim is *Teague*-barred. I would hold that Ayala's claim is *Teague*-barred because it was not "dictated" by Supreme Court case law, and the case Ayala relies upon, *Thompson*, did not announce a clear constitutional rule. The majority confuses the wisdom of *Thompson* with whether that wisdom had been embraced by 2001.

*Thompson* is not a Supreme Court opinion and concerned a federal court trial, not a state court trial. Accordingly, it could not dictate the result in Ayala's case when his conviction became final. In *Massachusetts Delivery Ass'n v. Coakley*, 671 F.3d 33, 47 (1st Cir. 2012), the First Circuit reiterated that "[s]tate courts are not bound by the dictates of

---

[4] The dissent argued that the majority's choice of an adversarial proceeding over an in camera proceeding was contrary to the Supreme Court's decision in *Batson* not to formulate particular procedures. *Id*. at 1262 (Sneed, J., dissenting).

the *lower* federal courts, although they are free to rely on the opinions of such courts when adjudicating federal claims." (internal citations omitted.).  Similarly, in *Bromley v. Crisp*, 561 F.2d 1351, 1354 (10th Cir. 1977), the Tenth Circuit noted that "the Oklahoma Courts may express their differing views on the retroactivity problem or similar federal questions until we are all guided by a binding decision of the Supreme Court."  Also, in *U.S. ex rel. Lawrence v. Woods*, 432 F.2d 1072, 1076 (7th Cir. 1970), the Seventh Circuit agreed that "because lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts."  Consistent with our sister circuits' decisions, our prior opinion in *Thompson*, which was an appeal from a federal criminal action, was not binding on the California Supreme Court.

Furthermore, even though the logic behind the opinion in *Thompson* may be compelling, the opinion does not set forth a clear rule of constitutional law.  The opinion recognized that there were "occasional departures from" the norm of holding adversarial proceedings, noted a number of instances in which in camera proceedings were appropriate, and concluded that departure from the norm "*may* amount to a denial of due process."  *Id*. at 1258–59 (emphasis added). The language in *Thompson* is vague compared, for example, to our statement in *Menefield v. Borg*, 881 F.2d 696, 699 (9th Cir. 1989), that "we hold that the right to counsel attaches to the motion for a new trial stage."

The fact that *Thompson* did not lay down a clear rule of constitutional law is confirmed by a review of other Ninth Circuit cases as well as decisions by our sister circuits.  In *Lewis v. Lewis*, 321 F.3d 824, 831 n.27 (9th Cir. 2003), we observed that "[c]ertainly, requiring a court to allow defense

counsel to argue [during the three-step *Batson* process] is not clearly established law." Thus, fifteen years after *Thompson* issued, we did not think that *Thompson* established a clear rule of constitutional law. In *Majid v. Portuondo*, 428 F.3d 112 (2d Cir. 2005), the Second Circuit commented that "[i]t remains at least arguable that courts holding *Batson* hearings may, to the contrary, hear the explanations in camera and outside the presence of the defendants." *Id*. at 128 (citations omitted). In *United States v. Tucker*, 836 F.2d 334, 340 (7th Cir. 1988), the Seventh Circuit noted that the Supreme Court in *Batson* expressly declined to formulate procedures and disagreed with the Ninth Circuit's opinion in *Thompson* insofar as it required "adversarial hearings once a defendant establishes a prima facie case of purposeful discrimination." Similarly, in *United States v. Davis*, 809 F.2d 1194, 1202 (6th Cir. 1987), the Sixth Circuit commented that *Batson* does not "require the participation of defense counsel while the Government's explanations are being proffered."

The majority strives mightily to distinguish these cases on the grounds that they are not well-reasoned, in some instances are dicta, and have been rejected by other circuits and most state courts. But the standard established by the Supreme Court for determining whether an issue is *Teague*-barred is not the merits of the old rule, or even recognition of the wisdom of the new rule, but whether the new rule was "dictated by precedent." *Caspari*, 510 U.S. at 390. These conflicting cases confirm that *Thompson* did not dictate the result in Ayala's case.

Moreover, as noted, the rule that the majority claims was established in *Thompson* is not a bright-line rule. Rather, at most, *Thompson* states that defense counsel could not be excluded absent some "compelling justification." *See*

Majority at p. 67. Here, the prosecutor offered an explanation for seeking to present his reasons in camera: he did not want to reveal his strategy to the defense. Following *Thompson* and the other cases cited by the majority, it is now clear that this is not a valid reason not to follow the norm of an adversarial proceeding.[5]  However, this was not firmly established in 2001 when Ayala's conviction became final.

In sum, I agree with the district court that the right to be present and have counsel present when the prosecution presented its reasons for its challenged recusals was not "dictated by precedent" when Ayala's conviction became final, and therefore the issue is *Teague*-barred.

## II

Assuming the issue is not *Teague*-barred, we must next turn to the question of what exactly the California Supreme Court held and what deference it is owed. The court first acknowledged that "no particular procedures are constitutionally required" to conduct a *Batson* hearing, thereby rejecting Ayala's federal claim. *Ayala*, 6 P.3d at 202. "The next question," it said, was "whether it was error to exclude defendant from participating in the hearings on his *Wheeler* motions." It concluded that "*as a matter of state*

---

[5] The California Supreme Court carefully considered the prosecutor's claim that his reasons for the recusals would disclose matters of strategy. It concluded that the prosecutor had "simply [given] the reasons for his challenges, reasons that defendant was entitled to hear and that disclosed no secrets of trial strategy." *Ayala*, 6 P.3d at 202–03. Accordingly, it concluded that "[i]t was unreasonable to exclude defendant from the hearings." *Id*. at 203. The California Supreme Court was right. However, for purposes of the application of *Teague*, the point is that this conclusion was neither dictated nor compelled when Ayala's conviction became final.

*law*, it was." *Id.* at 203 (emphasis added). After conducting a thorough review of relevant state and federal precedents, it reiterated that it had "concluded that error had occurred under state law" and "noted" *Thompson*'s suggestion that the error may amount to a denial of due process. *Id.* at 204. Nonetheless, it concluded that the error was "harmless under state law, and that, if federal error occurred, it, too, was harmless beyond a reasonable doubt as a matter of federal law." *Id.* (internal citations omitted). Thus, although there may be some question as to whether the California Supreme Court actually found that there was federal error, it clearly addressed Ayala's federal claim in determining that whatever federal error occurred, it was harmless as a matter of federal law.

The majority and I part ways as to how to review this holding. Because the state court adjudicated Ayala's federal claim on the merits and rejected it, we must accord that decision deference under AEDPA. *See Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013) ("[W]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") (internal citations omitted).

However, the majority's dislike for AEDPA drives it to try to avoid its provisions. In its initial opinion, the majority interpreted the Supreme Court's opinion in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), in such a manner as to allow it to grant relief without deferring to the California Supreme Court. *See Ayala v. Wong*, 693 F.3d 945, 961–63 (9th Cir. 2012). The majority now takes a different tack in an effort to circumnavigate AEDPA and review Ayala's 1989

state court conviction *de novo*.   Contrary to the Supreme Court's recent opinions, the majority deconstructs the California Supreme Court's opinion.   In doing so, the majority: (1) separates the California Supreme Court's finding of error under state law from its adjudication of the federal claim; (2) decides that the California Supreme Court did not determine whether there was error under federal law; and then (3) concludes that it has "no reason to give § 2254(d) deference" to the California Supreme Court's decision.  Majority at p. 25.

The majority's approach is fundamentally flawed for at least two reasons.  First, it is contrary to the Supreme Court's opinions directing that any question as to whether a state court considered a constitutional issue is to be resolved in favor of finding that it did.  *Richter v. Harrington*, 131 S. Ct. 770, 784–85 (2011); *Johnson v. Williams*, 133 S. Ct. 1088, 1094–96 (2013).   Second, by separating the California Supreme Court's determination of *Batson/Wheeler*[6] error from its adjudication of the federal claim, the majority evades giving the opinion the deference demanded by AEDPA and the United States Supreme Court.

---

[6] As the majority notes, *People v. Wheeler*, 22 Cal.3d 258 (1978), is the California analogue to *Batson*. *See* Majority at p. 6 n.1.  Accordingly, in cases arising out of California, claims that minority jurists were improperly excluded are sometimes referred to as *Batson/Wheeler* claims.

**A. Supreme Court precedent compels the conclusion that the California Supreme Court decided Ayala's federal claims on their merits.**

1. *The California Supreme Court's opinion.*

The California Supreme Court's evaluation of the *Batson*/*Wheeler* issue was clear and concise. It held that "it was error to exclude defendant from participating in the hearings on the *Wheeler* motions." *Ayala*, 6 P.3d at 203. Indeed, the California Supreme Court recognized that the error enhanced "the risk that defendant's inability to rebut the prosecution's stated reasons will leave the record incomplete." *Id*. at 204. As the majority admits, the California Supreme Court cited both *Batson* and our opinion in *Thompson* in concluding that "it seems to be almost universally recognized that ex parte proceedings following a motion regarding peremptory challenges allegedly made on the basis of improper group bias are poor procedure and should not be conducted unless compelling reasons justify them." *Ayala*, 6 P.3d at 203.

The California Supreme Court then turned to the question of prejudice and held:

> We have concluded that error occurred under state law, and we have noted *Thompson*'s suggestion that excluding the defense from a *Wheeler*-type hearing may amount to a denial of due process. We nonetheless conclude that the error was harmless under state law (*People v. Watson* (1956) 46 Cal.2d 818, 836, 299 P.2d 243), and that, if federal error occurred, it, too, was

harmless beyond a reasonable doubt
(*Chapman v. California* (1967) 386 U.S. 18,
24) as a matter of federal law.

6 P.3d at 204. There can be no doubt that the California
Supreme Court adjudicated the federal claim, first by
implicitly rejecting it, and then, as an alternative holding,
finding that any error was harmless.

   2. *The majority's deconstruction of the California
      Supreme Court's opinion.*

   The majority acknowledges this portion of the California
Supreme Court's opinion. Majority at p. 14. However, it
then proceeds to mull over whether the state court (a) held
there was error under federal constitutional law, (b) held there
was no error under federal constitutional law, or (3) did not
decide whether there was error under federal constitutional
law. *Id*. These are idle musings, for the "only question that
matters under § 2254(d)(1)" is whether the petitioner's claim
was adjudicated on the merits, and whether that adjudication
was contrary to or an unreasonable application of clearly
established Supreme Court precedent. *Lockyer v. Andrade*,
538 U.S. 63, 71 (2003). Whether one agrees with the
California Supreme Court's decision or not, the federal claim
was clearly adjudicated.

   The majority, although purporting to accept that the
California Supreme Court found constitutional error,
proceeds to argue that "alternatively" the exception to

deference set forth in *Richter* applies.[7] Majority at pp. 19–20. Exactly how the majority reaches this conclusion is not clear. Here is its explanation:

> *Richter* and *Williams* instruct us to afford a rebuttable presumption that a fairly presented claim was "adjudicated on the merits" for purposes of § 2254(d), but this presumption is rebuttable if there is "any indication or state-law procedural principles" supporting the conclusion that the state court did not adjudicate the federal claim on the merits. *Richter*, 131 S. Ct. at 784–85. Here, the California Supreme Court denied Ayala relief overall but did so by (1) finding that the trial court committed error on state law grounds, (2) failing to make any express determination of error on federal constitutional grounds, and (3) finding any error harmless under *both* the state and federal standards for harmless error.

---

[7] This "alternate" approach, in addition to being incorrect, serves to obscure the majority's separation of the California Supreme Court's determination that there was federal constitutional error from that court's determination that any error "was harmless beyond a reasonable doubt *as a matter of federal law*." *Ayala*, 6 P.3d at 204 (internal citation omitted, emphasis added). Without its alternate approach, the majority would be hard pressed not to give the California Supreme Court's determination of harmless error the deference it is entitled to under AEDPA. This, obviously, is our primary area of disagreement. I would, applying AEDPA, defer to the California Supreme Court's opinion. The majority, instead, concocts an approach that circumvents AEDPA in order that it may review Ayala's 1989 conviction *de novo. See* Majority at p. 37 ("If we cannot say that the exclusion of defense counsel with or without the loss of the questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim, then we must grant the writ.").

> In the context of these holdings, the rebuttable presumption that *Richter* and *Williams* instruct us to afford is, in fact, rebutted. The California Supreme Court, by finding any alleged error harmless under both the state and federal standards for harmless error, had no reason to reach the question of whether federal constitutional error occurred.

Majority at p. 20.

The majority then argues that the California Supreme Court "would have had good reason not to decide the merits of the federal constitutional issue" because courts generally do not pass on questions of constitutionality unless adjudication is unavoidable. Majority at p. 20. Also, by analogy it draws on cases involving claims of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), where the Supreme Court has interpreted a state court's silence as a failure to reach an issue and thus not an adjudication on the merits. Majority at pp. 21–22.

The majority then proffers its vision of the law: "There are circumstances in which, even if a state court has denied relief overall, a state court's silence with respect to a fairly presented federal issue cannot be interpreted as an 'adjudication on the merits' of that issue for purposes of § 2254(d), because the rebuttable presumption cited in *Richter* and *Williams* is rebutted by the legal principles involved (including the principle of constitutional avoidance) and factual context applicable to a particular case." Majority at p. 23. This novel approach allows the majority to assert that the "California Supreme Court had no reason to reach

Ayala's federal constitutional claim," and to conclude that it has "no reason to give § 2254 deference" to the California Supreme Court's decision.  Majority at pp. 23–25.

   3. *The majority's approach is contrary to recent Supreme Court opinions*.

   The majority's deconstruction of the California Supreme Court's opinion, besides being unnecessary dicta and unpersuasive, is contrary to recent Supreme Court opinions that were directed at the Ninth Circuit.  In both *Richter*, 131 S. Ct. 770, and *Johnson*, 133 S. Ct. 1088, the Supreme Court reversed us for failing to give proper deference to the state courts' opinions.[8]  Moreover, the Supreme Court set forth a clear standard that leaves no doubt that here the California Supreme Court considered Ayala's federal claims on their merits.

   In *Richter*, the Court stressed that AEDPA "bars relitigation of any claim 'adjudicated on the merits in state court,' subject only to the exceptions in §§ 2254(d)(1) and (d)(2)."  131 S. Ct. at 784 (internal quotation marks omitted).  The Court noted that there does not need to be "an opinion from the state court explaining the state court's reasoning," and the state court need not say it was adjudicating the federal claim on its merits.  *Id.*  It further held that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id*. at 784–85.

---

   [8] *See Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009); *Williams v. Cavazos*, 646 F.3d 626 (9th Cir. 2011).

Two years later, in *Williams*, a unanimous Supreme Court found it necessary to remind us of this standard. Williams challenged his conviction for first degree murder on the ground that the trial court improperly dismissed a juror. 133 S. Ct. at 1093. The California state courts denied him relief and the district court denied Williams' habeas petition. Judge Reinhardt, writing for a three-judge panel of the Ninth Circuit, held that despite the *Richter* presumption, the state courts had not adjudicated Williams' federal claim,[9] applied a *de novo* standard of review, and granted relief. *Williams*, 646 F.3d at 641, 653.

The Supreme Court firmly rejected our opinion. It first noted that the assumption that a federal claim was overlooked by the state court is wrong for a number of reasons, including: (1) "there are circumstances in which a line of state precedent is viewed as fully incorporating a related federal

_____

[9] The panel had reasoned:

> It is obvious, not "theoretical" or "speculat[ive]," that Williams's constitutional claim was not adjudicated at all, and so the *Richter* presumption is overcome. *Id*. at 785. Specifically, the portion of the court's opinion concerning the discharge of Juror No. 6 reveals that the court upheld his dismissal on the sole basis that the trial court had not abused its discretion in applying section 1089. That the court engaged in an extended discussion of Williams's statutory claim, but made no mention whatsoever of her more fundamental constitutional claim, is a compelling "indication" that the court either overlooked or disregarded her Sixth Amendment claim entirely, rather than that it adjudicated the claim but offered no explanation at all for its decision.

*Williams v. Cavazos*, 646 F.3d 626, 639 (9th Cir. 2011). The majority appears to follow a similar course in the case at bar.

constitutional right,"[10] *Williams*, 133 S. Ct. at 1094; (2) "a state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim," *id*. at 1095; and (3) "there are instances in which a state court may simply regard a claim as too insubstantial to merit discussion." *Id*. The Supreme Court concluded that, "[w]hen a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits." *Id*. at 1096.

If federal courts are to presume that a state court considers a federal claim even when the court does not expressly address the claim, it follows that where, as here, the California Supreme Court's opinion clearly reflects that the court was aware of the federal claims, we must accept that the federal claims were "adjudicated on the merits," and limit any relief according to § 2254(d). *See Richter*, 131 S. Ct. at 784.

The majority, however, seizes on the Supreme Court's statement that the presumption "can in some limited circumstances be rebutted," *Williams*, 133 S. Ct. at 1096, and adopts a definition of the exception that swallows the presumption. The majority asserts that the presumption does not apply because "it was not necessary for the state court to reject the claim of federal constitutional error on the merits in order for it to deny relief to the petitioner," and because "the facts of this case dictate the conclusion that the California Supreme Court believed that the error under state law also

---

[10] The Supreme Court specifically noted that "[i]n California, for example, the state constitutional right to be present at trial is generally coextensive with the protections of the Federal Constitution." 133 S. Ct. at 1094–95 (internal quotation marks omitted).

constituted federal constitutional error." Majority at pp. 16–17. The first reason is contrary to *Williams* because the Supreme Court held that the presumption applies even where the state court regards a federal claim "as too insubstantial to merit discussion." 133 S. Ct. at 1095. The second proffered reason is also contrary to *Williams* because the Court held that the presumption applies where "state precedent is viewed as fully incorporating a related federal constitutional right." *Id*. at 1094.

Furthermore, in order to rebut the *Richter* presumption there must be "reason to think some other explanation for the state court's decision is more likely." *Richter*, 131 S. Ct. at 785. But here, there can be no doubt that the California Supreme Court did consider Ayala's federal claims, first by stating that "no particular procedures are constitutionally required" to hold a *Batson* hearing, and then, in the alternative, holding that any federal error was harmless. *Ayala*, 6 P.3d at 202–04. Thus, the California Supreme Court's opinion is not *best* read as addressing Ayala's federal claims, as the majority admits,[11] but can *only* be so read.

In sum, a review of the California Supreme Court's opinion allows for only one conclusion: that the court considered Ayala's federal claims. Moreover, even if this conclusion was not mandated, and the presumption set forth by the Supreme Court in *Richter* and *Williams* came into play, the presumption would be controlling. Because the

---

[11] The majority states: "if we were compelled to determine whether the California Supreme Court adjudicated Ayala's federal claim on its merits in favor of the petitioner or the state, we would hold without the slightest hesitation that it found that error occurred under federal constitutional law." Majority at p. 19.

California Supreme Court considered Ayala's federal claims (and, in any event, must be presumed to have done so), the AEDPA standard of review applies.

## B. The majority applies a *de novo* standard of review and fails to give proper deference to the California Supreme Court's opinion.

The majority's treatment of the California Supreme Court's ruling on the *Batson/Wheeler* violation is a smoke screen designed to obscure the fact that the majority reviews prejudice *de novo* rather than under the AEDPA deference standard. This approach cannot be squared with the Supreme Court's recent opinions, which require that we ask whether the California Supreme Court's determination that the error was harmless beyond a reasonable doubt was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fair minded disagreement." *Richter*, 131 S. Ct. at 786–87.

### 1. *Deference is mandated by the statute and Supreme Court precedent.*

The applicable provisions of AEDPA are codified in 28 U.S.C. § 2254.[12] The Supreme Court's opinions hold that

---

[12] Section 2254(d) reads in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

>> (1) resulted in a decision that was contrary to, or

the AEDPA standard applies to the California Supreme Court's finding of harmless error.  In *Richter*, the Supreme Court reiterated that federal habeas relief is not available "unless it is shown that the earlier state court's decision 'was contrary to' federal law then clearly established in the holdings of this Court," or "'was based on an unreasonable determination of the facts' in light of the record before the state court."  131 S. Ct. at 785 (internal citations omitted). Thus, it does not matter whether the California Supreme Court's determination of harmless error is a question of fact, or law, or mixed; it is entitled to deference under AEDPA.

The Supreme Court further elaborated on the applicable standard.   In *Richter*, it held that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  131 S. Ct. at 786 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).  In addressing prejudice in a claim of ineffective

---

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

assistance of counsel under *Strickland*, the Supreme Court held:

> [A] challenger must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." [*Strickland v. Washington*, 466 U.S. 668] at 694 [(1984)]. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id*. at 693. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687.

131 S. Ct. at 787–88. The Supreme Court again emphasized this deference when it reversed us in *Felkner v. Jackson*, 131 S. Ct. 1305 (2011).[13]

---

[13] Although the majority here engages in considerably more analysis than we did in *Felkner*, the Supreme Court's admonition remains instructive. The Court held:

> The *Batson* issue before us turns largely on an "evaluation of credibility." 476 U.S., at 98, n.21. The trial court's determination is entitled to "great deference," *ibid*., and "must be sustained unless it is clearly erroneous," *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008).

> That is the standard on direct review. On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and

2. *The majority's alternate standard of review is contrary to Supreme Court precedent.*

The majority, however, invokes *Brecht v. Abrahamson*, 507 U.S. 619 (1993), in order to justify what is, in essence, a *de novo* standard of review. Majority at pp. 33–37. The majority asserts that relief may be granted if we find that the error had a "substantial and injurious effect or influence in determining the jury's verdict," Majority at p. 33 (quoting *Brecht*, 507 U.S. at 623), or "if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action for the whole, that the judgment was not substantially swayed by the error," Majority at p. 34 (quoting *Merolillo v. Yates*, 663 F.3d 444, 454 (9th Cir. 2011)), or even where a "judge feels himself in virtual equipoise as to the harmlessness of the error." Majority at p. 35 (quoting *Merolillo*, 663 F.3d at 454). That the majority essentially conceives of this as *de novo* review is obvious from its declaration that "[i]f we cannot say that the exclusion of defense counsel with or without the loss of the questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim, then we must grant the writ." Majority at p. 37.

---

"demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 130 S. Ct. 1855, 1862, (2010) (internal quotation marks omitted). Here the trial court credited the prosecutor's race-neutral explanations, and the California Court of Appeal carefully reviewed the record at some length in upholding the trial court's findings. The state appellate court's decision was plainly not unreasonable. There was simply no basis for the Ninth Circuit to reach the opposite conclusion, particularly in such a dismissive manner.

131 S. Ct. at 1307.

*Brecht* was decided before the passage of AEDPA. In *Fry v. Pliler*, 551 U.S. 112, 121 (2007), the Supreme Court held that "in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*." However, in doing so, the Supreme Court construed the *Brecht* standard as including the AEDPA standard:

> Three years after we decided *Brecht*, Congress passed, and the President signed, the [AEDPA], under which a habeas petition may not be granted unless the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States . . . ." 28 U.S.C. § 2254(d)(1). In *Mitchell v. Esparza*, 540 U.S. 12 (2003) (per curiam), we held that, when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination* itself was unreasonable. Petitioner contends that § 2254(d)(1), as interpreted in *Esparza*, eliminates the requirement that a petitioner also satisfy *Brecht*'s standard. We think not. That conclusion is not suggested by *Esparza*, which had no reason to decide the point. Nor is it suggested by the text of AEDPA, which sets forth a precondition to the grant of habeas relief ("a writ of habeas corpus . . . shall not be granted" unless the conditions of § 2254(d)

are met), not an entitlement to it. Given our
frequent recognition that AEDPA limited
rather than expanded the availability of habeas
relief, *see, e.g.*, *Williams v. Taylor*, 529 U.S.
362, 412 (2000), it is implausible that, without
saying so, AEDPA replaced the *Brecht*
standard of "'actual prejudice,'" 507 U.S., at
637 (quoting *United States v. Lane*, 474 U.S.
438, 449 (1986)), with the more liberal
AEDPA/*Chapman* standard which requires
only that the state court's harmless-beyond-
a-reasonable-doubt determination be
unreasonable. That said, it certainly makes no
sense to require formal application of both
tests (AEDPA/*Chapman and Brecht*) when
the latter obviously subsumes the former.

551 U.S. at 119–20.

Three aspects of the Supreme Court's explanation are
particularly important. First, the Court endorsed its prior
opinion in *Esparza*, 540 U.S. 12, that habeas relief was
available only if the state court's determination of
harmlessness was unreasonable. *Fry*, 551 U.S. at 119.
Second, the Court reiterated that AEDPA "limited rather than
expanded the availability of habeas relief." *Id*. Third, the
Court held that the *Brecht* "actual prejudice" standard
requires a greater showing than the "the more liberal
AEDPA/*Chapman* standard which requires only that the state
court's harmless-beyond-a-reasonable-doubt determination be
unreasonable." *Id*. at 119–20. *See also Brecht*, 507 U.S. at
637 (holding that habeas petitioners "are not entitled to
habeas relief based on trial error unless they can establish that
it resulted in 'actual prejudice'"); *Pulido v. Chrones*, 629 F.3d

1007, 1020 (9th Cir. 2010) (holding that because the petitioner "did not suffer any actual prejudice, he is not entitled to habeas relief").

The majority attempts to evade the deference inherent in the AEDPA/*Brecht* standard by quoting language from *Merolillo*, 663 F.3d at 454. The majority asserts that when a judge is "in virtual equipoise as to the harmlessness of the error" and has "grave doubt about whether an error affected a jury [substantially and injuriously], the judge must treat the error as if it did so." Majority at p. 35 (citations omitted).

The majority takes this standard out of context. *Merolillo* does not suggest that the state court's opinion is not entitled to deference. Our opinion first recognized that we continue to look to the last reasoned decision of the state court, and that the state court's findings "are entitled to a presumption of correctness unless the petitioner rebuts the presumption with clear and convincing evidence." 663 F.3d at 453 (citing 28 U.S.C. § 2254(e)(1)). Although the opinion refers to the Supreme Court's prior elucidations on harmless error, we concluded that *Brecht*'s "substantial and injurious effect" standard governs our harmless error review. *Merolillo*, 663 F.3d at 455. Our opinion also determined that applying the AEDPA/*Chapman* standard, the state court's determination of harmless error was objectively unreasonable. *Id.*

   3. *Deference to the state court opinion reconciles* Brecht *and the Supreme Court's recent opinions*.

The majority fails to appreciate that even when focusing on harmlessness, a state court's factual findings are entitled to deference, *see, e.g.*, *Mansfield v. Sec'y, Dep't of Corr.*,

679 F.3d 1301, 1309 (11th Cir. 2012), and that this deference informs the definition of "grave doubt." In order to grant relief, a federal court must have "grave doubt" as to the harmlessness of the error. Critically, the Supreme Court's opinions mandate that this "grave doubt" be objective rather than subjective. Our personal perspectives as to harmlessness are not controlling. Rather, we are directed to consider whether "there is no possibility fairminded jurists could disagree" with the state court's decision, and whether there "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87. Thus, by definition, where fairminded jurists can disagree, there is no "grave doubt" as to the harmlessness of the error. In other words, in state habeas petitions subject to AEDPA, any objective "grave doubt" as to the harmlessness of an error is dispelled by a determination that "fairminded jurists" could disagree.

The reach of this mandate from *Richter* can be illustrated by considering the majority's statement in a footnote. The majority opines that the California Supreme Court's conclusion that Ayala was not prejudiced was "an unreasonable application of *Chapman*.[14] *Chapman*, decided

---

[14] The majority states:

> In holding that Ayala has demonstrated his entitlement to relief under *Brecht*, we therefore also hold to be an unreasonable application of *Chapman* the California Supreme Court's conclusion that Ayala was not prejudiced by the exclusion of the defense during *Batson* steps two and three or by the loss of the questionnaires.

Majority at p. 34 n.13.

some 30 years before the passage of AEDPA, held "that before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id*. at 24. AEDPA does not change the constitutional standard, but it does alter the standard applied by federal courts when reviewing a state prisoner's habeas petition. AEDPA limits relief to instances where the state court adjudication was "an unreasonable application of, clearly established Federal law," or "an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d). The Supreme Court's opinions in cases such as *Richter* and *Williams* provide an objective measure for what is unreasonable under AEDPA: a state court's determination of a federal claim is unreasonable only if no fairminded jurist could agree with it.

In this case, consistent with the Supreme Court's opinions, a writ may not issue just because "we cannot say that the exclusion of defense counsel and the loss of questionnaires likely did not prevent Ayala from prevailing on his *Batson* claim." Majority at p. 37. Rather, a writ may issue only if we determine (using the majority's language) that there is a "grave doubt as to the harmlessness of the error," meaning that no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his *Batson* claim.[15]

---

[15] This approach is also consistent with the Supreme Court's opinion in *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). There the Court held that "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas petition must overcome the limitation of § 2254(d)(1) on the record that was before that state court." *Id*. at 1400. The federal court must look at the record that was before the state court and determine whether fairminded jurists could disagree with the state court's decision. Furthermore, the Court in reviewing the habeas petition in *Pinholster*

*See, e.g.*, *Richter*, 131 S. Ct. at 786–87. As set forth in the next section, fairminded jurists can concur in the California Supreme Court's determination of harmless error.

## III

A review of the record shows that although the loss of the questionnaires and the exclusion of defense counsel constitute error, fairminded jurists can agree with the California Supreme Court that those facts did not prevent Ayala from prevailing on his *Batson* claim.

### A. The loss of certain prospective jurors' questionnaires.

The majority states that it is "unable to evaluate the legitimacy of some of the prosecution's proffered reasons for striking the black and Hispanic jurors because they referred to questionnaires that are now lost." Majority at p. 39. Of course, this statement misses the mark because the real question is whether the record was sufficient to allow the California Supreme Court to review Ayala's claims as he presented them to that court. A review of the California Supreme Court's opinion and Ayala's filings shows that the state court fully and fairly considered his claims. Furthermore, Ayala has not shown that the loss of certain

---

applied a deferential standard of review. It held that "Pinholster has not shown that the California Supreme Court's decision that he could not demonstrate deficient performance by his trial counsel necessarily involved an unreasonable application of federal law," and that "Pinholster also has failed to show that the California Supreme Court must have unreasonably concluded that Pinholster was not prejudiced." *Id*. at 1403–04, 1408.

prospective jurors' questionnaires violated his constitutional rights or that the loss prejudiced him.

First, it is critical to note what was in the record before the California Supreme Court. The record contained the voir dire transcript for all prospective jurors, the transcript of the in camera hearings on the prosecutor's reasons for the recusals, the questionnaires of all the seated jurors, and the questionnaires of the alternate jurors. What was missing were the 77-question, 17-page questionnaires the 200 or so other potential jurors had filled out.

In *Boyd v. Newland*, 467 F.3d 1139 (9th Cir. 2006), we recognized that the Supreme Court's opinion in *Miller-El v. Dretke*, 545 U.S. 231 (2005), holds that "comparative juror analysis is an important tool that courts should utilize in assessing *Batson* claims."[16]  *Boyd*, 467 F.3d at 1145.  We commented that "comparative juror analysis" referred "to an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." *Id*. *Boyd* concluded:

> A reviewing court cannot examine the "totality of the relevant facts" and "all relevant circumstances," *Batson*, 476 U.S. at 94, surrounding a prosecutor's peremptory strike of a minority potential juror without an

---

[16] We further held that the right to a comparative juror analysis explicitly set forth in *Miller-El* was not *Teague*-barred as it "simply illustrates the means by which a petitioner can establish, and should be allowed to establish, a *Batson* error."  *Boyd*, 467 F.3d at 1146 (internal citation omitted).

> entire voir dire transcript. A transcript of the
> complete voir dire, as distinct from a partial
> transcript up to the time of the *Batson* motion,
> is proper because comparative juror analysis
> is appropriate both at the time of the *Batson*
> motion and in light of all subsequent voir dire
> testimony.

467 F.3d at 1151. Here, we have the entire voir dire transcript. Moreover, there is nothing in *Boyd* to suggest that in addition to the voir dire transcript, juror questionnaires from jurors who are not selected are essential to a determination of the totality of the relevant facts.

Indeed, the opposite conclusion can be drawn from our treatment in *Boyd* of a California rule requiring an indigent defendant to show some cause in order to receive a free transcript of voir dire. We held, citing *United States v. MacCollum*, 426 U.S. 317, 322–23 (1976), that the California rule did not violate the Constitution, but that the state court erred in failing to recognize that the defendant had raised a plausible *Batson* claim entitling him to a transcript of voir dire. *Boyd*, 467 F.3d at 1151. If a defendant can be required to show some cause in order to receive a transcript of voir dire, it follows that a defendant has no *per se* right to the preservation of all questionnaires filled out by prospective jurors who were not seated.

To be fair, there is language in our en banc opinion in *Kesser v. Cambra*, 465 F.3d 351 (9th Cir. 2006) (en banc), that could be read to infer a right to juror questionnaires. We concluded that: "In this case, an evaluation of the voir dire transcript and juror questionnaires clearly and convincingly refutes each of the prosecutor's nonracial grounds,

compelling the conclusion that his actual and only reason for striking [a juror] was her race." *Id*. at 360. But this statement shows only that where juror questionnaires are available, we will consider them, not that the questionnaires are necessary. Instead, we commented that a comparative juror analysis was appropriate because "[w]e too have a transcript of voir dire and a *Batson* claim fairly presented, and that is all *Miller-El* requires." *Id*. at 361.

In addition, we recently commented on the lack of questionnaires of excused jurors in *Briggs v. Grounds*, 682 F.3d 1165 (9th Cir. 2012). *Briggs* concerned a *Batson* challenge to a state court conviction where the federal record did not contain the questionnaires of excused jurors. *Id*. at 1170. In affirming the district court's denial of relief, the majority noted:

> The dissent seems to conclude that because we cannot independently verify the answers from the questionnaires as they are not in the record, the defense's characterization is equally, if not more, plausible despite the state court determinations to the contrary. However, "AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt," *Felkner v. Jackson*, [*sic*] 131 S. Ct. 1305, 1307 (2011) (per curiam) (internal quotation marks omitted) (overturning the Ninth Circuit). The dissent's readiness to doubt the state court determination based on the defendant's characterization of the record does not apply the appropriate level of deference Congress

and the United States Supreme Court have required of us.

*Id.* at 1170–71.  The majority in *Briggs* further noted that "it is widely acknowledged that the trial judge is in the best position to evaluate the credibility of the prosecutor's proffered justifications."  *Id.* at 1171 (internal citations omitted).  Citing the Supreme Court's statements in *Rice v. Collins*, 546 U.S. 333, 338–39 (2006), that a "federal habeas court can only grant Collins' petition if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge," we stated in *Briggs* that:

> it would be anathema to AEDPA if we were to assume that the petitioner's contentions about the questionnaires are true simply because the record before us does not contain the excused jurors' questionnaires.  The burden to disprove the factual findings rests with Briggs.  28 U.S.C. § 2254(e)(1) (requiring "clear and convincing evidence" to rebut "a determination of a factual issue made by a State court").

*Id.*

It follows that the lack of prospective jurors' questionnaires does not relieve Ayala of his burden to show by clear and convincing evidence that the California Supreme Court was wrong in determining that the prosecutor was not biased.  Accordingly, we must determine whether Ayala has shown that the lack of these questionnaires in his case renders the record insufficient for a determination of his federal claim.  He fails in this task for several reasons.

First, the California Supreme Court reasonably rejected Ayala's claim that his constitutional rights were infringed by the loss of the bulk of prospective juror questionnaires. It explained:

> The deficiency of which he complains is the absence of certain questionnaires, which were completed by prospective jurors, then lodged with the superior court, subsequently lost by its clerk's office, and finally determined by the superior court to be beyond reconstruction. A criminal defendant is indeed entitled to a record on appeal that is adequate to permit meaningful review. That is true under California law. [Citation.] It is true as well under the United States Constitution — under the Fourteenth Amendment generally, and under the Eighth Amendment specifically when a sentence of death is involved. [Citation.] The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal. ([*People v. Alvarez*, 14 Cal.4th 155,] at p. 196, fn.8 [1996]).

*Ayala*, 6 P.3d at 208. The California Supreme Court concluded that if the loss of the questionnaires was error under either federal or state law, "it was harmless beyond a reasonable doubt." *Id*. This determination is reasonable and entitled to deference. *Rice*, 546 U.S. at 338–39.

Second, the determination is reasonable because the missing juror questionnaires are not critical to Ayala's federal

claims. The questionnaires of the 70 or so jurors who were never called are not relevant because Ayala does not allege, let alone show, that the potential jurors were excused due to constitutionally forbidden reasons.

Third, none of the prosecutor's stated reasons for recusing the questioned jurors relied solely, or even primarily, on the jurors' questionnaires. Rather, in each instance the prosecutor mentioned the juror's specific answers to questions posed on voir dire. In a couple of instances the prosecutor referenced a person's questionnaire, but this was primarily to explain why the prosecutor found the individual's oral responses troubling.

Finally, Ayala has ably presented his specific *Batson* challenges based on the voir dire transcript and the extant questionnaires of the seated jurors and alternates. Although Ayala argues that the lost questionnaires might support his arguments, such a contention can be made about any lost document. If such speculation constituted prejudice, the standard would be reduced to a *per se* rule.

## B. Challenges to the Individual Jurors

The remaining issue is whether Ayala has shown by clear and convincing evidence that no reasonable jurist could have credited the prosecutor's non-discriminatory reasons for excusing the seven jurors in issue. In other words, whether at least one fairminded jurist could agree with the California Supreme Court's opinion. The majority discusses only three of the jurors in its opinion, but a review of the prosecutor's reasons for excusing each of the seven jurors shows that the California Supreme Court's determination that "the

challenged jurors were excluded for proper, race-neutral reasons" was reasonable. *See Ayala*, 6 P.3d at 204.

### 1. *Olanders D.*

Olanders D. was one of the first jurors challenged by Ayala. The trial court held that Ayala had not met the first prong of the *Batson* test (a prima facie showing that the challenge was based on race, *see Kesser*, 465 F.3d at 359), but nonetheless indicated that it would hear the prosecutor's reasons for the recusal in order to have a complete record. The prosecutor stated in the ex parte proceeding:

> My primary concern with regard to [Olanders D.] is his ability to vote for the death [sentence] during the penalty phrase. On his questionnaire he indicated that he does not believe in the death penalty. He did indicate that his view had changed over the last several years. He told us that he did want to serve. During the time that he was questioned, I felt that his responses were not totally responsive to the questions of either counsel for the defense or myself.
>
> My observations in reading his questionnaire and before even making note of his racial orientation was that his responses on the questionnaire were poor. They were not thought out. He demonstrated a lack of ability to express himself well. And his answers did not make a lot of sense. As a result, I felt that he is not a person who could actively participate in a meaningful way in

deliberations with other jurors, and his ability to fit in with a cohesive group of 12 people I sincerely question, and it was for that reason plus his stand on the death penalty that led me to believe that I did not want him on this jury.

The trial judge responded:

Okay. Certainly with reference to whether or not he would get along with 12 people, it may well be that he would get along very well with 12 people. I think the other observations of counsel are accurate and borne out by the record.

The California Supreme Court held that the record showed that the challenged jurors were excluded for proper, race-neutral causes. *Ayala*, 6 P.3d at 204. Addressing Olanders D., the court commented:

[T]he prosecutor stated he had exercised the challenge in part because his questionnaire indicated he opposed the death penalty. The prosecutor acknowledged Olanders D.'s oral statements that his views had changed, but commented that his answers were "not totally responsive to the questions of either counsel for the defense or myself." He further stated, in essence, that Olanders D.'s difficulties in communicating led him to question whether he would "fit in" on the jury. The court disagreed with the latter point, noting, "it may well be that he would get along very well with 12 people," but added: "I think the other

observations of counsel are accurate and
borne out by the record."

*Id.* The California Supreme Court further noted that the trial
court "credited the prosecutor's opinion[] that Olanders D.
opposed the death penalty." *Id.* at 206.

The majority claims that the prosecutor's motives for
excusing Olanders D. is suspect for several reasons. First,
Ayala "could have pointed to seated white jurors" who
similarly expressed hesitancy to impose the death penalty.
Majority at p. 41. Second, the majority asserts that its review
of the voir dire transcript shows that "Olanders D.'s answers
were responsive and complete." Majority at p. 42. Third, it
claims that the responses of a seated white juror were just as
unresponsive. Majority at p. 43. The majority concludes that
none of the reasons proffered by the prosecutor should be
sustained because one was rejected by the trial judge, "two
failed to distinguish the juror whatsoever from at least one
seated white juror," and the fourth cannot be evaluated
because his questionnaire was lost. Majority at p. 44.

Were we reviewing the trial judge's decision *de novo*, the
majority's approach might be persuasive. But the applicable
standard is whether no fairminded judge could agree with the
California Supreme Court's determination that the juror was
excluded for proper, race-neutral reasons. *See Richter*,
131 S. Ct. at 786. Ayala does not come close to meeting this
standard.

There is no suggestion that any seated juror raised a
similar set of concerns as Olanders D. The trial judge, who
had the opportunity to observe Olanders D., agreed with the
prosecutor that Olanders D. was ambivalent about the death

penalty, had not been responsive on his questionnaire, and lacked the ability to express himself clearly.  Moreover, the trial judge did not necessarily reject the prosecutor's concern that Olanders D. could not participate in a meaningful way in jury deliberations, but rather only commented that it "may well be that he would get along very well with 12 people [on the jury]."  The trial court's determinations as affirmed by the California Supreme Court are presumed correct.  *Rice*, 546 U.S. at 338–39 ("State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.' § 2254(e)(1).").

The majority's expressed concerns about Olanders D.'s recusal are far from compelling.  It is hardly surprising that a number of potential jurors expressed ambivalence about the death penalty.  The fact that a prosecutor is more concerned with one potential juror's ambivalence than another is not necessarily a sign of racial prejudice.  Similarly, the fact that the majority in reviewing the voir dire transcripts thinks that a seated juror's responses were no more responsive than Olanders D.'s is really of little moment.  As noted, the trial judge — who heard Olanders D.'s voir dire — agreed with the prosecutor that he "demonstrated a lack of ability to express himself well."  The majority's supposition that Olanders D.'s questionnaire responses may not have been "poor" is not clear or convincing evidence of anything.  At most, the majority's arguments and assumptions may suggest that the prosecutor's evaluation of Olanders D. was not compelled, but none of them really question the sincerity of the prosecutor's reasons or suggest a likelihood of some unstated improper motive.  The majority fails to show that a fairminded jurist could not have agreed with the California Supreme Court.

The only indicia of possible racial bias was the fact that seven of the eighteen peremptory challenges exercised by the prosecutor excused African-American and Hispanic jurors. If this were enough to compel a finding of racial bias, there would be no reason for the second and third steps in the *Batson* standard or for deference to the trial court's determinations. The lack of any compelling evidence of racial bias is clear when the record in this case is compared to the prosecutor's statements in *Kesser*, 465 F.3d 351. There, in overcoming the deference due to the state court's determinations, we commented: "The racial animus behind the prosecutor's strike is clear. When he was asked to explain why he used a peremptory challenge to eliminate [a juror], he answered using blatant racial and cultural stereotypes." *Id.* at 357. Here, in contrast, all the majority can do is suggest that other jurors, like Olanders D., were uncomfortable with the death penalty, failed to offer thoughtful answers, and did not communicate well. But even if the prosecutor's perceptions about Olanders D. were incorrect or not unique, that fact would not be such compelling evidence of pretext as to justify a failure to defer to the California Supreme Court's reasoned determination that the jurors were excused for proper, race-neutral reasons.

## 2. *Gerardo O.*

Gerardo O. was one of the recusals that Ayala challenged in his second objection. The prosecutor explained his challenge to Gerardo O. as follows:

> I made an observation of [Gerardo] when he first entered the courtroom on the first day that the jurors were called into the area.

At that time, he appeared to not fit in with anyone else. He was a standoffish type of individual. His dress and his mannerisms I felt were not in keeping with the other jurors.

He indicated to us at the beginning that he was illiterate. Actually, his words were that he was illiterate, and that he therefore had the questionnaire translated to him, so that he could make responses.

I observed him on subsequent occasions when he came to the court, and observed that he did not appear to be socializing or mixing with any of the other jurors, and I also take into account his responses on the questionnaire and in the *Hovey* questioning process, at which time he expressed that he had no feeling with regard to the death penalty in writing.

When being questioned, he said that he was not sure if he could take someone's life, or if he could take someone's life into his hands.

He further responded in the *Hovey* process that there would be eleven other people, that he felt a little shaky as far as his responsibilities in this case.

For those reasons, I felt that he would be an inappropriate juror, and for that reason, I exercised the peremptory challenge.

The trial court accepted the prosecutor's reasons. It noted that the record supported the prosecutor's observations and commented that the recusal was based on Gerardo O.'s individual traits. The California Supreme Court in rejecting Ayala's *Wheeler/Batson* claim noted that "Gerardo O. struggled with English and did not understand the proceedings." *Ayala*, 6 P.3d at 206.

The majority does not deny that Gerardo O. stated that he was illiterate, or that he needed someone to fill out his questionnaire, or that he dressed differently, or that he did not mix with the other jurors. *See* Majority at pp. 45–49. Instead, the majority speculates that Ayala's lawyer might have shown that despite his own comments, Gerardo O. was not illiterate, and that Geraldo O.'s "dress and mannerisms were distinctly Hispanic."[17] Majority at p. 46. It further muses that the prosecutor's comments concerning Gerardo

---

[17] The majority's cited quote from *Hernandez v. New York*, 500 U.S. 352 (1991), demonstrates that *Hernandez* is not applicable to this case. The Supreme Court noted "the prosecutor's frank admission that his ground for excusing these jurors related to their ability to speak and understand Spanish raised a plausible, though not a necessary, inference that language might be a pretext for what in fact were race-based peremptory challenges." *Id*. at 363. Here, the prosecutor did not mention any concern with Gerardo O.'s ability to speak Spanish and there does not appear to be any indication that any juror's ability to speak Spanish was an issue. Instead, the majority, having poured over the record to determine that Gerardo O., despite his own admission of illiteracy, had "attended college in the United States," opines that he "was perfectly capable of reading the summary of legal issues that was given to prospective jurors." Majority at pp. 45–46. It then leaps to the unsupported conclusion that the prosecutor's purported reason for striking Gerardo O. was directly related to his status as someone who spoke Spanish as his first language. Majority at p. 46. The majority's speculation may not be illogical, but it is far from compelling.

O.'s manner and aloofness and his ambivalence toward the death penalty could have been pretexts for an underlying racial bias.[18]   Majority at pp. 48–49.   Of course, it is impossible to negate such possibilities, but there is nothing but the majority's imagination to fuel its assertions.[19]   Here, the trial judge agreed with the prosecutor's observations of Gerardo O. and the California Supreme Court affirmed.  The majority has not presented the type of clear evidence that the United States Supreme Court has held is necessary to overcome our deference to state court findings.  *See Rice*, 546 U.S. at 338–39.

   3.  *Robert M.*

   Robert M. was one of the last persons whose recusal was challenged.  The prosecutor explained his reasons as follows:

> As far as [Robert M.] is concerned, Miss Michaels and I had discussions during the selection process here in court, even as late as immediately before the exercise of the last challenge.

---

[18] The majority also suggests that Gerardo O.'s ambivalence to the death penalty was no more pronounced than some seated white jurors.  Majority at pp. 48–49. As previously noted, the potential jurors' attitudes toward the death penalty was an important consideration for both the defense and the prosecution.  The fact that the prosecutor distinguished between levels of ambivalence that the majority over twenty years later argues are indistinguishable is hardly a sign of pretext.  Moreover, there is no doubt that Gerardo O.'s qualifications — professed illiteracy, distinctive dress and aloofness, and ambivalence to the death penalty — were unique.

[19] The majority goes so far as to fantasize that "perhaps" unbeknownst to the trial judge, Gerardo O. "had even organized a dinner for some of them at his favorite Mexican restaurant."  Majority at p. 47.

The court would note that I had passed at one point, leaving [Robert M.] on.

I have always felt some degree of reluctance with regard to [Robert M.], and my concern primarily is in the area of whether, after conviction, [Robert M.] would actually vote for the death penalty, and it was my view that taking all of his responses in *Hovey* into account, and the — some of his responses even as late as yesterday — for example, the following of the Sagon Penn case. It was Miss Michaels doing the questioning at that time, and I did not actually — it would have been possibly a disadvantage or a disservice to inquire further as to his impressions about the Sagon Penn case.

I'm concerned about that case because the fact that Mr. Penn, in a very notorious trial here, was found not guilty in a second trial, and allegations of misconduct with regard to the District Attorney's office and the police were certainly rampant in that case.

There's really no way for me to inquire as to where [Robert M.] actually stood.

As far as [Robert M.] is concerned, our scores, a combination of all the factors — Mr. Cameron graded [Robert M.] as a four, Miss Michaels had rated [Robert M.] as a five, and my score on him was four to a five, somewhere in that area.

I had before doing any of the selection process, resolved that at the very best, we would not wish to have any jurors on this case whose combined score was five or less.

In spite of that, I passed once on him, but it is my view, basically, that because of his attitudes with regard to the death penalty, such as in his first response to whether he would always vote for — well, in the question number one about whether he would always vote for guilt, he indicated that it was a difficult question.

He said that he believed in the death penalty, but it was hard for him to be involved in the death penalty.

With regard to questions about whether he would vote for death, he said no, it would be hard to say, no, I don't know what the evidence is, and Miss Michael's reasons, which she expressed to me, and I have to agree with, is a great degree of concern about whether if we get to that point he could actually vote for death, and having that kind of a question in my mind as I'm trying this case would be distracting and worrisome to me during the process of the trial.

The trial judge accepted the prosecutor's reasons, noting that although Robert M. "is certainly pro the death penalty," his answers varied and "there may well be a legitimate concern as to whether or not he could impose it." The court

further noted that "an appropriate use of a peremptory would be for a person that any party feels either could not vote for death or could not vote for life." In affirming Ayala's conviction the California Supreme Court observed "that Robert M. was less than desirable from the prosecution's point of view." *Ayala*, 6 P.3d at 206.

Again, the majority does not really question the prosecutor's reasons, but speculates that had Ayala's counsel been present he might have argued that Robert M.'s reluctance to impose the death penalty was not different from other jurors' reluctance. Majority at pp. 50. In addition, the majority does not deny that Robert M. had stated that he had followed the Sagon Penn case, but argues that he only mentioned this briefly.[20] Majority at p. 51. Nonetheless, Robert M.'s interest in a recent notorious criminal case that involved misconduct by the prosecutor and resulted in a not guilty verdict is a legitimate non-discriminatory reason for recusal by the prosecutor.

---

[20] The extent of the majority's speculation is illustrated by its argument that because another juror who was seated mentioned that he was aware of the capital case *People v. Harris*, 623 P.2d 240 (Cal. 1981), the prosecutor's concern with Robert M.'s interest in the Sagon Penn case may have been pretextual. Majority at pp. 67–68. This argument assumes that somehow the *Harris* case was similar to the Sagon Penn case. This seems unlikely as the crime in *Harris* took place in 1978, some eleven years before the jury selection process in this case. Moreover, unlike the alleged verdict in the Sagon Penn case, Harris was found guilty and the California Supreme Court's opinion, which issued in 1981, did not find any serious misconduct by the district attorney.

4.  *The Other Jurors*

The only other recused juror that the majority mentions is George S. *See* Majority at pp. 40–41 n.17. The prosecutor explained that he had recused George S. because he (a) stated that he had sat on a prior jury and "was the one hold-out with regard to whatever issue was being presented at that time"; (b) was equivocal on the death penalty, (c) had been rejected as a police officer candidate, and (d) placed undue emphasis on the Bible. The trial judge commented that the prosecutor's observations were accurate. The majority does not deny that the prosecution offered these individualized grounds for the recusal. Instead, the majority dismisses the fact that George S. had been a holdout juror with the comment that it was a civil action and speculates that George S.'s alleged emphasis on the Bible "cannot be evaluated at all" because of the loss of the questionnaires. *See* Majority at pp. 40–41 n.17. Again, perhaps the majority's assertions suggest that the prosecutor's views were not compelled, but they do not really undermine their reasonableness or sincerity.

There were valid nondiscriminatory grounds for recusing the remaining three minority jurors. Galileo S. was recused because he (a) displayed a non-conformist attitude to the justice system, (b) had more run-ins with the law than he admitted, and (c) had an attitude that might create alienation and hostility on the part of other jurors. Luis M. was challenged because he (a) expressed ambivalence on the death penalty, (b) had investigated the case on his own, and (c) left the military with a low rank suggesting some sort of misconduct or inability to perform. Barbara S. was challenged because (a) her responses to oral questions were slow, (b) she had an empty look in her eyes and seemed out

of tune with what was going on, and (c) her written and oral answers were incomplete and non-responsive.

As with the other recused jurors, the prosecution team offered individualized reasons for each of these recusals. There is no blatant racism, no reference to stereotypes (veiled or otherwise), and no discernable pattern of discrimination in the reasons advanced by the prosecution. Nonetheless, these recusals are susceptible to the type of speculative challenges that the majority hurls at the recusals of Olanders D., Gerardo O., and Robert M. In all likelihood, other jurors expressed ambivalence and equivalence about the death penalty, other jurors offered slow or incomplete responses, and other jurors probably had been denied employment or performed poorly in a job. These might be appropriate avenues to explore at the time that a recusal is made. But we are reviewing a 1989 state trial pursuant to AEDPA, and the Supreme Court in its recent opinions has reiterated that (a) *Batson* issues turn largely on evaluations of credibility, (b) the trial court's determination is entitled to great deference, (c) the determination must be sustained unless it is clearly erroneous, and (d) AEDPA demands that state-court decisions be given the benefit of the doubt. *See Felkner*, 131 S. Ct. at 1307.

The California Supreme Court may not have been compelled to conclude that "the challenged jurors were excluded for proper, race-neutral reasons." *Ayala*, 6 P.3d at 204. But its conclusion was objectively reasonable. That is, Ayala has not shown that the California Supreme Court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786–87. As in *Richter*, the majority's opinion "illustrates a lack of deference to the state court's

determination and an improper intervention in state criminal processes, contrary to the purpose and mandate of AEDPA and to the now well-settled meaning and function of habeas corpus in the federal system." *Id.* at 787.

## IV

The Supreme Court decided *Batson v. Kentucky* in 1986, a year after Ayala killed three men and three years before his murder conviction. In *Batson*, the Supreme Court declined "to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." 476 U.S. at 99. I would hold that Ayala's claim that he had a constitutional right to have counsel present when the prosecutor offered its reasons for the challenged recusals was not dictated by precedent when Ayala's conviction became final, and thus is *Teague*-barred.

Ultimately, however, this case turns on the reasonableness of the California Supreme Court's 2000 opinion that the absence of defense counsel and the loss of jury questionnaires were harmless error beyond a reasonable doubt as a matter of federal law. *Ayala*, 6 P.3d at 204. Following the Supreme Court's pointed guidance in *Richter*, 131 S. Ct. 770, and *Williams*, 133 S. Ct. 1088, we must conclude that the California Supreme Court adjudicated Ayala's federal claims on their merits and thus apply AEDPA's deferential standard of review.[21]

---

[21] I do not agree with some of the majority's characterizations of my dissent. I have set forth my reasons in this dissent and trust the reader will be able to discern the respective merits of the majority and dissent without further assistance. To the extent the majority accuses me of relying heavily on recent Supreme Court opinions such as *Richter*, 131 S. Ct. 770,

This standard of review mandates that we determine whether fairminded jurists could agree with the California Supreme Court. In other words, we can grant relief only if no fairminded jurist could find that the exclusion of defense counsel and the loss of questionnaires did not prevent Ayala from prevailing on his *Batson* claim. Here, the evidence of valid non-pretextual reasons for the prosecutor's recusals renders the state court's decision objectively reasonable.

Because the majority fails to appreciate that Ayala's federal claim is *Teague*-barred, and applies a *de novo* standard of review, despite the Supreme Court's contrary directions, I dissent.

## ORDER

The opinion and dissenting opinion, filed on September 13, 2013, and published at 730 F.3d 831, are replaced by the amended opinion and amended dissenting opinion filed concurrently with this Order.

Judges Reinhardt and Wardlaw voted to deny the petition for rehearing en banc. Judge Callahan voted to grant the petition. A judge requested a vote on whether to rehear this matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. The request for rehearing en banc is **DENIED**. No further petitions will be entertained.

---

*see* Majority at p. 35–36, n.14, the accusation is accurate.

Judge Ikuta's dissent from denial of rehearing en banc is filed concurrently with this Order.

IKUTA, Circuit Judge, joined by O'SCANNLAIN, TALLMAN, BYBEE, CALLAHAN, BEA, M. SMITH, and N.R. SMITH, Circuit Judges, dissenting from the denial of rehearing en banc:

The Supreme Court has twice before rejected the approach to habeas review that the panel majority adopts here. In two prior habeas opinions, *Richter v. Hickman*, 578 F.3d 944 (9th Cir. 2009) (en banc), and *Williams v. Cavazos*, 646 F.3d 626 (9th Cir. 2011), we brushed aside the deference we owe a state court's adjudication of a petitioner's claim under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), and reviewed a petitioner's claim de novo. The Supreme Court unanimously reversed both of these opinions. It held that we must defer to a state court denial of a federal claim even if the state court issued only a summary denial, *Harrington v. Richter*, 131 S. Ct. 770, 784–85 (2011), and even if the state court issued a reasoned opinion that did not expressly reject the federal claim, *Johnson v. Williams*, 133 S. Ct. 1088, 1094–96 (2013).

Undeterred, the panel majority now tries yet another route to de novo review. It reasons that the Supreme Court has not yet *directly* told us that we must defer to a state court decision holding that any potential federal constitutional error was harmless. Therefore, the panel majority concludes, we can review such a claim de novo, free of AEDPA deference. In reaching this conclusion, the panel majority ignores the clear command of AEDPA and the Supreme Court, and creates a

circuit split. Because we should interpret AEDPA in accordance with the statutory language and the direction provided by the Supreme Court, I respectfully dissent from the court's failure to rehear this case en banc.

I

The length and complexity of the panel majority's opinion cannot disguise the fact that it circumvents the Supreme Court's ruling in *Richter* and *Williams* that "a federal habeas court must presume that the federal claim was adjudicated on the merits." *Williams*, 133 S. Ct. at 1096. Here, Juan Ayala presented his claim—that the Constitution required defense counsel to be present when the prosecutor presented his reasons for striking certain jurors—to the California Supreme Court, and the court rejected that claim. Twice.

The facts underlying Ayala's claim are straightforward. Ayala was charged with multiple murders. During jury selection, he argued that the prosecutor was striking jury panelists on the basis of their race or ethnicity in violation of *People v. Wheeler*, 22 Cal. 3d 258 (1978),[1] and its federal analogue, *Batson v. Kentucky*, 476 U.S. 79 (1986). *See*

---

[1] *Wheeler* presaged *Batson* by interpreting the California Constitution to prohibit race-based peremptory challenges. *See Wade v. Terhune*, 202 F.3d 1190, 1192 (9th Cir. 2000). The California Supreme Court has stated that "[s]ubstantially the same principles apply under *Batson*" as under *Wheeler*. *People v. Alvarez*, 14 Cal. 4th 155, 193 (1996). Although there are some differences between the *Wheeler* and *Batson* standards, *see Wade*, 202 F.3d at 1196–97, those differences are not applicable here. Accordingly, "because we are reviewing [Ayala's] petition for a writ of habeas corpus under 28 U.S.C. § 2254, we generally refer to *Batson* in analyzing his claims." *Mitleider v. Hall*, 391 F.3d 1039, 1042 n.2 (9th Cir. 2004).

*People v. Ayala* (*Ayala I*), 24 Cal. 4th 243, 259–60 (2000).
The trial court asked the prosecutor to explain his reasons for
those challenges, but the prosecutor expressed concern about
doing so in open court for fear of revealing his trial strategy.
*Id.* at 260. To alleviate this concern, the trial court held three
ex parte hearings to consider the prosecutor's reasons for his
challenges, and each time found that the prosecutor was not
challenging jury panelists because of race or ethnicity. *Id.*

On direct appeal to the California Supreme Court, Ayala
challenged his exclusion from the ex parte *Batson* hearings.
The court addressed the issue at length. *See id.* at 259–69. It
began by reciting the *Batson/Wheeler* procedure for
determining whether a prosecutor's peremptory challenges
were discriminatory. *Id.* at 260–61. First, the defendant must
make a prima facie case that the prosecutor used his
peremptory challenges to exclude "members of a cognizable
group" because of their group association. *Id.* at 260.
Second, the burden shifts to the prosecutor "to provide a race-
neutral explanation for the exercise of peremptory
challenges." *Id.* Third, the trial court must determine
"whether those stated reasons are untrue and pretextual." *Id.*
at 261.

After explaining the necessary steps in a court's
adjudication of a *Batson/Wheeler* claim, the California
Supreme Court held that, so long as "the inquiry proceeds
within the general framework just articulated, no particular
procedures are constitutionally required." *Id.* The court's
conclusion rested on *Powers v. Ohio*, 499 U.S. 400 (1991),
which stated, with respect to *Batson* hearings, that "'[i]t
remains for the trial courts to develop rules, without
unnecessary disruption of the jury selection process, to permit
legitimate and well-founded objections to the use of

peremptory challenges as a mask for race prejudice.'" *Ayala I*, 24 Cal. 4th at 261 (quoting *Powers*, 499 U.S. at 416). This conclusion resolved Ayala's federal constitutional claim that *Batson* required the trial court to include the defendant or defense counsel in the hearings on the prosecutor's reasons for striking jury panelists.

While rejecting Ayala's constitutional claim, the court went on to consider "whether it was error to exclude defendant from participating in the hearings on his *Wheeler* motions" as a matter of California law. *Id.* at 262. Because "[t]he question whether ex parte communications are proper in ruling on a *Wheeler* motion ha[d] not arisen in California decisional law," the court surveyed the legal landscape, citing cases from the Fourth, Sixth, Seventh, Eighth, Ninth, and Eleventh Circuits, as well as cases from New York, Maryland, and Texas that had considered analogous procedural issues. *Id.* It noted that "[w]hile some decisions have tolerated an ex parte *Batson* hearing procedure on the ground that the United States Constitution permits it," *id.* (citing *United States v. Tucker*, 836 F.2d 334, 340 (7th Cir. 1988), and *United States v. Davis*, 809 F.2d 1194, 1202 (6th Cir. 1987)), most courts to have considered the issue determined that ex parte proceedings were "poor procedure and should not be conducted unless compelling reasons justify them," *id.* at 262–63. Aligning itself with the majority, the court held that, as a matter of state procedure, trial courts should not hold ex parte *Batson/Wheeler* hearings, and therefore "that error occurred under state law" in Ayala's case. *Id.* at 263–64. Nevertheless, after a careful review of the record pertaining to the seven challenged jurors, including the transcripts of the exchanges between the prosecutor and the judge, the court concluded that the prosecutor's peremptory challenges did not exclude a cognizable group

from the jury on a discriminatory basis. *Id.* at 264–68. Consequently, although the trial court erred in light of the newly adopted state procedure, "the error was harmless." *Id.* at 268. And any potential federal error "was harmless beyond a reasonable doubt," according to the California Supreme Court. *Id.* at 269 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

In short, the California Supreme Court considered Ayala's *Batson* claim, rejected it on the merits, and followed that up by holding that any potential error was harmless. Given that *Richter*, 131 S. Ct. at 784–85, and *Williams*, 133 S. Ct. at 1094–96, require us to presume that the state court adjudicated a claim on the merits when the claim was presented to the state court and the state court denied relief, there is no doubt the court adjudicated Ayala's claim on the merits here. Therefore, the only question is whether the state court's adjudication of Ayala's *Batson* claim was an unreasonable application of Supreme Court precedent.

As the California Supreme Court pointed out, "no particular procedures are constitutionally required." *Ayala I*, 24 Cal. 4th at 261. *Batson* itself "decline[d] . . . to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges," 476 U.S. at 99, and the Supreme Court has left it to the lower courts to "develop [the] rules," *Powers*, 499 U.S. at 416. No subsequent Supreme Court case has given further instruction on *Batson* procedures, and certainly no Supreme Court case has foreclosed the use of ex parte proceedings. Therefore, the California Supreme Court's rejection of Ayala's *Batson* claim in this case was not contrary to, or an unreasonable application of, clearly established Supreme Court caselaw, and we should have affirmed the district court.

II

Contrary to Supreme Court precedent, the plain language of AEDPA, and the decisions of our sister circuits, the panel majority here reasons that no AEDPA deference is owed to the state court's opinion. Am. Maj. Op. at 5, 11–12. Notwithstanding the presumption established by *Richter* and *Williams*, the panel majority concludes that the state court did not adjudicate Ayala's claim on the merits because the state court never analyzed the merits of Ayala's *Batson* claim and held only that any federal error would have been harmless. As a threshold matter, this misreads the state court's opinion. The California Supreme Court addressed and rejected Ayala's *Batson* claim on the ground that no particular procedures are constitutionally required, and only later reinforced its rejection of the *Batson* claim by holding that any potential error was harmless. But even if the state court had limited itself to holding that any federal error was harmless, the panel majority's analysis of whether the state court adjudicated Ayala's claim on the merits is wrong.

*Williams* held that we must presume that a state court adjudicated a federal claim on the merits, and that this presumption is rebutted only "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." 133 S. Ct. at 1097.[2]

---

[2] As *Williams* demonstrated, this presumption is quite robust. In *Williams*, the California Court of Appeal had rejected a petitioner's claim regarding the dismissal of a juror, citing only a California Supreme Court opinion, *People v. Cleveland*, 25 Cal. 4th 466 (2001), and other principles of state law. *People v. Taylor*, No. B137365, 2002 WL 66140, at *8 (Cal. Ct. App. Jan. 18, 2002). *Cleveland*, in turn, had discussed but rejected two federal circuit court opinions that themselves addressed the Sixth Amendment. 25 Cal. 4th at 480–84. *Williams* concluded that the state

Here, "the evidence leads very clearly to the conclusion" that the California Supreme Court did not inadvertently overlook Ayala's *Batson* claim: it discussed the claim, found no error, ruled that any potential error would be harmless, and denied relief overall. Under *Williams*, therefore, we must presume that the state court adjudicated Ayala's claim on the merits, and the only question left is whether that adjudication was an unreasonable application of Supreme Court precedent. *See* 28 U.S.C. § 2254(d).

The panel majority attempts to evade this conclusion by insisting that the rebuttable presumption discussed in *Richter* and *Williams* is rebutted in this case by the "principle of constitutional avoidance." Am. Maj. Op. at 19–20, 23. The panel majority reasons that "the California Supreme Court had no reason to reach Ayala's federal constitutional claim" because it could resolve the claim as a matter of state law, and "under long established legal principles, the California Supreme Court had every reason not to decide unnecessarily a question of federal constitutional law." *Id*. at 24. Because there was no compelling reason for the California Supreme Court to have evaluated the claim of constitutional error, the panel majority concludes that the California Supreme Court did not adjudicate Ayala's *Batson* claim on the merits. *Id.* at

court's mere mention of *Cleveland* was enough to show that the state court understood it was resolving a question of federal constitutional law. 133 S. Ct. at 1098–99. Accordingly, *Williams* held that the state court had adjudicated the petitioner's Sixth Amendment claim on the merits, and rejected the Ninth Circuit's conclusion to the contrary. *Id.* at 1099. Given the Supreme Court's determination that the state court adjudicated a petitioner's federal claim because it referenced an earlier state opinion that itself mentioned federal circuit court opinions, the California Supreme Court's direct discussion and rejection of Ayala's *Batson* claim in this case was a clear adjudication of that claim on the merits.

23–25.[3] It is obvious that this conclusion directly reverses the presumption in *Williams*. Where *Williams* would hold that we presume a state court reached the federal issue, the panel majority holds that we presume the state court did everything in its power to *avoid* reaching that federal issue.

The panel majority supports its reverse presumption by reference to Supreme Court cases granting relief to habeas petitioners raising ineffective assistance of counsel claims. *Id.* at 21–22 (citing *Porter v. McCollum*, 558 U.S. 30 (2009); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003)). But these cases offer no support for the panel majority's novel theory. In those cases, a state court rejected a petitioner's ineffective assistance claim on either the deficiency or prejudice prong, and did not reach the other prong. Applying § 2254(d), the Supreme Court concluded in each case that the state court's adjudication of

---

[3] A confusing aspect of the panel majority's opinion is its observation that "*if* we were required to determine whether the California Supreme Court adjudicated Ayala's claim of federal constitutional error on its merits in favor of the petitioner or the state, we *would* hold without question that the California Supreme Court found error in petitioner's favor under both state law and federal constitutional law." Am. Maj. Op. at 18 (emphases altered). The panel majority refers to this scenario as "Option 1." *Id.* at 14. "Option 1" would present a very different case: Had the California Supreme Court held that the trial court committed a *Batson* error, and had Ayala challenged only the court's determination under *Chapman* that such error was harmless, we would have to decide the open question of how AEDPA would apply to that type of adjudication on the merits. But the panel majority does not resolve this question, and instead makes the fatal error of holding that the California Supreme Court did not adjudicate Ayala's federal claim on the merits, whether in favor of Ayala, *see id.* at 12 n.3, 15 n.4, or against him. Thus, while the panel majority discusses the "Option 1" scenario at great length, it elects instead to presume (contrary to *Richter* and *Williams*) that the state court avoided an "Option 1" scenario by deciding Ayala's claims on state law grounds.

one of the *Strickland* prongs was contrary to, or an unreasonable application of, *Strickland*.  Because the state court did not reach the other prong, the Supreme Court addressed it de novo.  *Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.  These cases are consistent with *Williams*, because the state court's express refusal to reach one of the *Strickland* prongs rebuts the presumption that the state court adjudicated that prong on the merits.  Moreover, because the Supreme Court determined that the state court's analysis of one prong was an unreasonable application of *Strickland*, it was freed from AEDPA deference, and could review the other prong of the *Strickland* claim de novo.  *Porter*, 558 U.S. at 39; *Rompilla*, 545 U.S. at 390; *Wiggins*, 539 U.S. at 534.[4]

Moreover, the Supreme Court has never suggested that when a state court rejects a petitioner's claim because any potential error was harmless, we can review the claim de novo because that claim was not fully adjudicated on the merits.  Such a conclusion contravenes *Richter* and *Williams*, which instruct us to presume that a state court has adjudicated a claim on the merits and to apply AEDPA deference when a state court has denied relief overall, regardless of the grounds for denying relief.  The panel majority's interpretation also contradicts the commonsense interpretation of "adjudicated on merits."  We have held that the term "adjudicated on the merits"  as used in § 2254(d) means that "the petition . . . was

---

[4] Another case cited by the panel majority, *Cone v. Bell*, 556 U.S. 449 (2009), is equally inapplicable.  Am. Maj. Op. at 22–23.  In *Cone*, the Supreme Court held that when a state court erroneously finds a procedural default and therefore has not reached the merits of a claim, a federal court can do so.  556 U.S. at 469–72.  No one suggests that Ayala procedurally defaulted his *Batson* claim.

either granted or denied, [and] . . . that the grant or denial rest[s] on substantive, rather than procedural, grounds." *Lambert v. Blodgett*, 393 F.3d 943, 966 (9th Cir. 2004); *see also Barker v. Fleming*, 423 F.3d 1085, 1092 (9th Cir. 2005). A determination that any error was harmless is a denial of relief on "substantive . . . grounds." Accordingly, a decision that any error was harmless is an adjudication on the merits, and we should apply § 2254(d) to that adjudication. The majority's failure to do so is contrary to the command of § 2254(d) and our precedents interpreting it.

Not only does the panel majority's approach contradict AEDPA and our precedent, it also conflicts with the conclusion reached by our sister circuits. As the Tenth Circuit recently explained, "[w]here a state court assumes a constitutional violation in order to address whether the defendant was actually harmed by the violation, as here, the state court takes the claim on the merits; it just disposes of it on alternative *merits*-based reasoning." *Littlejohn v. Trammell*, 704 F.3d 817, 850 n.17 (10th Cir. 2013). The Tenth Circuit concluded that because the state court rejected petitioner's constitutional claim on the ground that any error was harmless, it "render[ed] a decision that is on the merits for purposes of AEDPA." *Id.* at 850 n.17. Accordingly, the Tenth Circuit proceeded to consider whether the adjudication of the constitutional claim was an unreasonable application of Supreme Court precedent. *Id.* The Seventh and Eighth Circuits have adopted a similar interpretation of "adjudicated on the merits." *See Anderson v. Cowan*, 227 F.3d 893, 898 (7th Cir. 2000) (considering a state court's rejection of a *Bruton* error on the ground that any such error was harmless beyond a reasonable doubt, and concluding that this rejection of the *Bruton* claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent);

*Whitmore v. Kemna*, 213 F.3d 431, 433 (8th Cir. 2000) ("[W]here the state court [] has conducted a *Chapman* harmless error analysis, . . . the claim has been 'adjudicated on the merits' in state court."). The panel majority's conclusion that claims rejected on harmless error grounds are not "adjudicated on the merits" thus conflicts with all other circuits to have considered the question.

This is not a case-specific error that will be confined to the facts of this opinion. The panel majority's approach sets the groundwork for authorizing federal courts to review a habeas petition de novo whenever a state appellate court rejects a petitioner's federal claim on harmlessness grounds, contrary to the Supreme Court's admonition to defer to the state court's decisions, and the general rule that § 2254(d) barely "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings," *Richter*, 131 S. Ct. at 786. The consequences of the panel majority's approach will reverberate throughout this circuit. The state courts within our circuit routinely resolve claims of federal error on the basis that any potential error was harmless. *See, e.g.*, *People v. Thomas*, 54 Cal. 4th 908, 936–37 (2012); *People v. Loy*, 52 Cal. 4th 46, 69–71 (2011); *Smith v. State*, 111 Nev. 499, 505–06 (1995); *State v. Walton*, 311 Or. 223, 229–31 (1991); *State v. Whelchel*, 115 Wash. 2d 708, 728–30 (1990); *Braham v. State*, 571 P.2d 631, 645–48 (Alaska 1977). Under the panel majority's rationale, we would give AEDPA deference to none of these determinations.

## III

Not only does the panel majority commit serious errors in its AEDPA analysis, it lands yet another blow to our AEDPA

jurisprudence by concluding that we review a state court's harmless error analysis under an exceptionally non-deferential standard. After erroneously concluding that the California Supreme Court did not adjudicate Ayala's *Batson* claim on the merits, Am. Maj. Op. at 23–25, and determining under de novo review that the state trial court committed a *Batson* error in holding an ex parte hearing with the prosecutor, *id.* at 26, the panel majority purports to apply the prejudice standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), to review the California Supreme Court's conclusion that any federal error was harmless, Am. Maj. Op. at 33–54.

But the panel majority's application of the *Brecht* prejudice standard contradicts the Supreme Court's direction in *Fry v. Pliler*, 551 U.S. 112 (2007). Under *Brecht*, a federal habeas court that determines there is constitutional error cannot grant relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638 (internal quotation marks omitted). Before *Pliler*, a federal court faced a conundrum in considering a state court's decision that a constitutional error was harmless beyond a reasonable doubt under *Chapman.* The federal habeas court had to determine whether to: (1) apply § 2254(d), and ask whether the state court's rejection of the petitioner's claim on harmlessness grounds was based on an unreasonable application of *Chapman*, (2) apply the general harmless error standard for habeas cases in *Brecht*, or (3) do both.

In *Pliler*, the Supreme Court sought to simplify the harmlessness assessment for federal courts and ensure that state courts received proper deference. It held that federal courts should apply the *Brecht* standard in every case because

it is more deferential to state courts. 551 U.S. at 119–20. *Pliler* explained that before AEDPA, the Supreme Court applied the *Brecht* standard of review to consider habeas claims of state trial errors, because *Brecht* provided a "more forgiving standard of review" than *Chapman*. *Id.* at 116. The Court then rejected the argument that the passage of AEDPA replaced *Brecht* with a more petitioner-friendly standard: "Given our frequent recognition that AEDPA limited rather than expanded the availability of habeas relief, it is implausible that, without saying so, AEDPA replaced the *Brecht* standard of actual prejudice [] with the more liberal AEDPA/*Chapman* standard which requires only that the state court's harmless-beyond-a-reasonable-doubt determination be unreasonable." *Id.* at 119–20 (internal quotation marks and citations omitted). Thus, it made sense to use the stricter *Brecht* standard in all habeas cases.

Nevertheless, given *Pliler*'s determination that the *Brecht* standard is more deferential to state courts than an AEDPA/*Chapman* analysis, it logically follows that if the state court's determination that an error is harmless beyond a reasonable doubt is *not* an unreasonable application of *Chapman*, then there is no prejudice under *Brecht*. *See Pliler*, 551 U.S. at 120 (*Brecht* "obviously subsumes" AEDPA/*Chapman* review). Anything else would be inconsistent with *Pliler*'s reasoning. It would also be contrary to § 2254(d), which provides that a federal court *cannot* grant the writ unless the state court's adjudication of a claim resulted in a decision that was contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *See Cudjo v. Ayers*, 698 F.3d 752, 768 (9th Cir. 2012) (stating that "if the California Supreme Court had appropriately applied the *Chapman* analysis in analyzing this

Constitutional error, this court would be required to defer to that analysis under AEDPA unless it was unreasonable").

Applying this reasoning here, the California Supreme Court's determination that the procedure adopted by the trial court in holding an ex parte hearing was harmless beyond a reasonable doubt was not an unreasonable application of *Chapman*. The California Supreme Court devoted several pages to a meticulous review of the trial court's decision regarding the seven jurors who were excluded and gave well-reasoned and supported explanations for why "the challenged jurors were excluded for proper, race-neutral reasons." *Ayala I*, 24 Cal. 4th at 264.

Because we would be compelled to defer to the state court under an AEDPA/*Chapman* framework, we necessarily should find no *Brecht* prejudice. *See Pliler*, 551 U.S. at 120. In contrast, the panel majority engages in not just de novo legal analysis, but de novo review of the record that piles speculation upon speculation instead of giving due deference to the finder of fact.[5] *See Batson*, 476 U.S. at 98 n.21. The

---

[5] One particularly striking example of the panel majority's highly speculative approach is worth mentioning here. The panel majority offers the following hypothesis regarding how Ayala's input might have changed the trial court's conclusion that the prosecutor's reason for challenging one of the potential jurors was a legitimate nondiscriminatory reason (the panel majority discusses only three of the seven):

> An inference of racial bias might [] have been drawn from the prosecutor's claim that Gerardo O. was challenged because he did not dress or act like other jurors, and did not mix or socialize with them. It is likely that Gerardo O.'s dress and mannerisms were distinctly Hispanic. Perhaps in the late 1980s Hispanic males in San Diego County were more likely than

panel majority's erroneous application of *Brecht* contradicts *Pliler* and dangerously muddles our caselaw.

IV

In sum, the panel majority's path to de novo review is contrary to the plain language of AEDPA, which precludes granting the writ unless the state court's adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The panel majority hops over AEDPA's "bar on federal court relitigation of claims already rejected in state proceedings," *Richter*, 131 S. Ct. at 786, with a novel theory that ignores recent Supreme Court jurisprudence and conflicts with our sister circuits. In fact, the panel majority's opinion raises every red flag that should have prompted us to rehear a case en banc. The approach to AEDPA embodied in the panel majority's opinion has already struck out twice at the Supreme Court. I fear that with this case, we are looking at a hat trick. Because we should have corrected these errors ourselves, rather than asking the

> members of other racial or ethnic groups in the area to wear a particular style or color of shirt, and Gerardo O. was wearing such a shirt (and for this reason did not 'fit in,' in the prosecutor's mind, with the other jurors). If so, and if defense counsel were able to bring this fact to the trial court's attention, the prosecution's explanation that it struck Gerardo O. because of his dress and mannerisms would provide compelling support for Ayala's claim that the strike was actually racially-motivated.

Am. Maj. Op. at 46. This sort of conjecture in the face of a contrary determination by the trier of fact has no place in analyzing prejudice.

Supreme Court to weigh in a third time, I respectfully dissent from the denial of rehearing en banc.